[No. S004425. Crim. No. 22503. Feb. 23, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES WILLIS JOHNSON, Defendant and Appellant.

1198

1202

1210

COUNSEL

James Kyle Gee, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Herbert F. Wilkinson, Dane R. Gillette and Mark S. Howell, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

PANELLI, J.—Defendant was convicted of the first degree murder (Pen. Code, § 187)[1] and robbery (§ 211) of Edward Dukar with findings of personal use of a firearm (§§ 12022.5, 1203.06). A special circumstance allegation under the 1978 death penalty law was found true: that the murder was committed while the defendant was engaged in the commission or attempted commission of robbery. (§ 190.2, subd. (a)(17)(i).) The jury fixed the punishment at death; the appeal is automatic. (Cal. Const., art. VI, § 11; § 1239.)

## I. GUILT PHASE FACTS

A. *Prosecution Case.*

Defendant was convicted of killing Edward Dukar on October 31, 1980, in Dukar's jewelry store in a small shopping center in Milpitas. The princi-

---

[1] Unless otherwise noted, all statutory references hereafter are to the Penal Code.

pal prosecution witness was Miller Peter Hodges, an accomplice, who testified as part of a plea bargain.

Hodges testified that he, defendant, and Thomas Fields drove to Dukar's jewelry store to rob him. Both defendant and Fields were armed. Fields and Hodges waited in the parked car while defendant went into Dukar's store to check out the situation. He returned a few minutes later saying there were some customers in the store and another sales clerk. After waiting a few minutes for the customers to leave, defendant returned to the store followed by Hodges and Fields. Defendant began talking to Dukar while Fields and Hodges talked to the clerk, Gary Ingalls. Ingalls was about to ask Dukar for the key to the display case when defendant pulled a gun and shot Dukar. Upon hearing the shot, Hodges and Fields ran from the store to the car.

Defendant fired three more shots at Dukar, broke the glass in the jewelry case, took two trays of rings, and fled. Defendant left behind a jewelry catalog that Dukar had given him earlier.

Hodges testified that defendant was carrying jewelry trays when he got to the car. An object about the size of a wallet fell from defendant's inside pocket. Defendant got in the car, and the three drove off.

When police arrived at the store, they found a wallet outside with the names of defendant's sisters imprinted on it. Inside the store they found the catalog that defendant had handled. On it were two of defendant's fingerprints. The coroner's report stated that Dukar had died from gunshot wounds to the head and chest.

Defendant was identified by store customers and nearby tenants. The most positive identification was by Marine Recruiting Sergeant W.M. Goodwin who had an office in the shopping center. Goodwin had stopped to say hello to Dukar while Dukar was talking to defendant shortly before the shooting. Goodwin identified defendant at a corporeal lineup and at trial. Gary Ingalls, the store clerk, said he recognized defendant at a lineup but was nervous and made no identification of him until the preliminary examination. Dolly Johnson, who had been in the store the first time defendant entered, had marked her card with a "possible" identification of defendant at the lineup. She was 99 percent sure at that time. She had asked the lineup participants to smile, and defendant had forced a smile. Later, when she saw defendant smiling naturally in court, she was 100 percent sure that defendant was the man who had smiled at her in Dukar's store. Less certain identifications of defendant were also made by Brad Kisela and Charles Ray, who had been in the store when Dolly Johnson was there.

B. *Defense Case.*

Defendant presented alibi testimony by his mother, stepfather, stepbrothers, his girlfriend, two women who were living at his mother's house, and employees of Hillhaven Convalescent Home in East Palo Alto. Their testimony was to the effect that defendant left home with his stepbrothers and girlfriend about 12:10 or 12:30 p.m. on the day Dukar was killed to attend a Halloween party at Hillhaven where defendant's stepbrother Barry worked. They arrived 10 to 15 minutes after leaving defendant's house. The witnesses' testimony varied, however, as to the time. The group could have arrived anywhere from 12:30 to 1:35. The varied defense testimony indicated that defendant stayed for 45 minutes to an hour.

Police had been dispatched to the murder scene about 12:52 p.m. It takes about 29 minutes to drive from the murder scene to defendant's residence.

Defendant's family testified that he had lost his wallet in early 1980. They remembered his complaints about it and searching the house for it. Department of Motor Vehicles' records showed that defendant had obtained a duplicate license in February 1980.

Defendant presented expert testimony that there were no fingerprints on the catalog of sufficient quality for comparison purposes. Defendant's mother testified that a few days before the robbery Hodges had come to her house with some jewelry cases and catalogs. Defendant had handled the catalog and had advised his mother not to deal with Hodges.

## II. JURY SELECTION ISSUES

A. *Representative Cross-section.*

 Defendant contends that the granting of hardship exclusions because of the projected length of the trial tended to systematically exclude poor persons in a disproportionate manner. His contention fails. Claims of denial of a fair cross-sectional jury are analyzed by ascertaining whether a cognizable class has been excluded. (*People* v. *Fields* (1983) 35 Cal.3d 329, 345 [197 Cal.Rptr. 803, 673 P.2d 680].) Even assuming that only poor persons were given hardship exclusions, a fact not proven here, persons with low incomes do not constitute a cognizable class. (*People* v. *Estrada* (1979) 93 Cal.App.3d 76, 91 [155 Cal.Rptr. 731]; see also *People* v. *Fields, supra,* 35 Cal.3d at pp. 348-349; *People* v. *Milan* (1973) 9 Cal.3d 185, 195-196 [107 Cal.Rptr. 68, 507 P.2d 956].)

 Defendant also contends that the process of death-qualifying a California jury results in the systematic underrepresentation of Blacks and

women on capital juries and denied him his right to a representative jury at the guilt phase. A majority of this court rejected such an argument in *People* v. *Fields, supra,* 35 Cal.3d at pages 349-350, footnote 7 (plur. opn.), 374 (Kaus, J., conc.).

■ Defendant further contends that the exclusion for cause of prospective jurors who would automatically vote against a death sentence deprived him of a representative jury. This claim has been rejected by both this court and the United States Supreme Court. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 78-79 [241 Cal.Rptr. 594, 744 P.2d 1127]; *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758].)

■ Defendant also assigns as error the trial court's denial of his motion pursuant to *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]. In *Wheeler,* we held that peremptory challenges may not be used to remove prospective jurors solely on the basis of presumed group bias. We defined group bias as a presumption that certain jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds. (*Id*. at p. 276.) ■ The United ed States Supreme Court similarly held in *Batson* v. *Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] that the Equal Protection Clause forbids peremptory challenges of potential jurors solely on account of their race when the defendant is a member of that race. Such challenges may not be used "to strike black veniremen on the assumption that they will be biased in a particular case simply because the defendant is black." (*Id*. at p. 97.)

We recognized in *Wheeler,* and the United States Supreme Court recognized in *Batson,* that peremptory challenges have historically served as a valuable safety valve in jury selection. We said in *Wheeler* that such challenges are permissible so long as they are based on specific bias, which we defined as a bias relating to the particular case on trial or the parties or witnesses thereto: "For example, a prosecutor may fear bias on the part of one juror because he has a record of prior arrests or has complained of police harassment, and on the part of another simply because his clothes or hair length suggest an unconventional lifestyle. In turn, a defendant may suspect prejudice on the part of one juror because he has been the victim of crime or has relatives in law enforcement, and on the part of another merely because his answers on voir dire evince an excessive respect for authority. Indeed, even less tangible evidence of potential bias may bring forth a peremptory challenge: either party may feel a mistrust of a juror's objectivity on no more than the 'sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another' [cita-

tion]—upon entering the box the juror may have smiled at the defendant, for instance, or glared at him." (*Wheeler, supra,* 22 Cal.3d at p. 275.)

*Batson* does not use the term "specific bias." It permits challenges so long as they may be justified by "a neutral explanation related to the particular case to be tried." (*Batson* v. *Kentucky, supra,* 476 U.S. at p. 98 [90 L.Ed.2d at p. 88].) The court emphasized, however, "that the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause." (*Id.* at p. 97 [90 L.Ed.2d at p. 88].)

■ Under *Wheeler* and *Batson,* if a party believes his opponent is improperly using peremptory challenges for a discriminatory purpose, he must raise a timely challenge and make a prima facie case of such discrimination. Once a prima facie case has been shown, the burden shifts to the other party to come forward with an explanation that demonstrates a neutral explanation related to the particular case to be tried. (*People* v. *Wheeler, supra,* 22 Cal.3d at pp. 280-282; *Batson* v. *Kentucky, supra,* 476 U.S. at pp. 96-98 [90 L.Ed.2d at pp. 87-89].) The court in *Batson* noted that the prosecutor may not rebut the defendant's prima facie case merely by denying that he had a discriminatory motive or affirming his good faith in making individual selections: "If these general assertions were accepted as rebutting a defendant's prima facie case, the Equal Protection Clause 'would be but a vain and illusory requirement.' "[2] (*Batson, supra,* at p. 98 [90 L.Ed.2d at p. 88].)

Both *Wheeler* and *Batson* profess confidence in the ability of the trial courts to determine the sufficiency of the prosecutor's showing. In *Wheeler,* we said that we will "rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination." (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 282.) The court indicated likewise in *Batson.* (*Batson* v. *Kentucky, supra,* 476 U.S. at p. 98, fn. 21 [90 L.Ed.2d at p. 89].) The trial court, however, must make "a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily. . . ." (*People* v. *Hall* (1983) 35 Cal.3d 161, 167-168 [197 Cal.Rptr. 71, 672 P.2d 854].)

---

[2]The dissent has taken this quotation out of context at pages 1287-1288 in using it to support the argument that subjective reasons are unacceptable. The United States Supreme Court said nothing about subjective versus objective reasons. Its concern was that the reasons be nondiscriminatory, clear, and reasonably specific. (*Batson* v. *Kentucky, supra,* 476 U.S. at p. 98, fn. 20 [90 L.Ed.2d at p. 88].)

In the present case the prosecutor exercised peremptory challenges to remove three Black jurors, four Jewish jurors and two Asian jurors. Defendant objected to exclusion of these jurors by a *Wheeler* motion.[3] The trial court did not make an express finding that defendant had made a prima facie case of group bias. However, the court asked the prosecutor "Do you wish to respond [to the defendant's *Wheeler* motion]?" It then proceeded to hear the prosecutor's explanations for the use of the peremptory challenges. In *People* v. *Turner* (1986) 42 Cal.3d 711 at pages 718-719 [230 Cal.Rptr. 656, 726 P.2d 102], a decision handed down after this case was tried, we concluded that such an inquiry by the trial court constituted "at least an implied finding" of a prima facie showing. Accordingly, we proceed to evaluate the prosecutor's explanations.

As to the Jewish jurors, the prosecutor stated that one was a "very nervous person," gave the defendants "a very noticeable smile," was opposed to the death penalty or leaned that way. The second person was 71 years old, looked tired, had a relative who was a lawyer, and felt the death penalty was not a deterrent. He seemed to have a great deal of rapport with defense counsel and appeared more friendly to the defendant than the average juror. The third person was 61 years old and was a "very tired appearing person." She was critical of a police department she had dealt with and she felt an officer had lied. She also gave defendants a very sympathetic look. The prosecutor thought the fourth person was "weird," that sympathy for the defendants might be a problem for him, and that he "didn't seem to be willing to commit to promises to make a decision based on the facts of the evidence." The prosecutor also stated he felt totally unable to relate to him.

As to the Asian jurors, one did not approve of the death penalty and said she could not pass judgment. She seemed to have some trouble understanding the people questioning her. The other person said she preferred life without possibility of parole over the death penalty and was concerned that the case be proven without any doubt. She had also contested a speeding ticket and had lost and had some feelings about that.

Regarding the three Black jurors, Ms. S.'s ex-husband was a policeman, and she seemed to be prejudiced against policemen. She had a brother-in-

---

[3] Defendant is Black. Under *Batson* v. *Kentucky, supra,* 476 U.S. at page 96 [90 L.Ed.2d at pages 87-88], defendant could challenge only the exclusion of the group of which he is a member. Under *Wheeler,* however, defendant need not be a member of the group to challenge its exclusion. (22 Cal.3d at p. 281; see also *People* v. *King* (1987) 195 Cal.App.3d 923, 931, fn. 3 [241 Cal.Rptr. 189].) Moreover, under *Batson* it is at least questionable whether the generic description Asian or a religious group can constitute a "cognizable group." (See *United States* v. *Sgro* (1st Cir. 1987) 816 F.2d 30.)

law who had been arrested and had known others who had gone to jail. She had a very defensive body position when the prosecutor questioned her and would not look at him when introduced. Her pulse seemed to race when the death penalty was mentioned. It was the practice of the prosecutor to rate each juror on a scale. Ms. T. was given a slightly lower than average rating by the prosecutor; he would have left her on had he had a jury panel where others had lower ratings. She was overweight and poorly groomed, indicating that she might not have been in the mainstream of people's thinking. She was very nervous about the death penalty and kept her hand over her mouth when talking about it. She didn't approve of the death penalty. She did not relate to the prosecutor and seemed not to trust him. Mr. F.S. had been arrested numerous times and had been in and out of jail and court many times as a defendant. "He talked about police officers abusing people and juries treating blacks differently, police treating blacks differently." He would not state a position on the death penalty and said he would require proof beyond a shadow of doubt. He did not come to court twice when asked to by the clerk.

After listening to the detailed explanations given by the prosecutor and the objections by defense counsel to the subjectivity of some of the cited reasons, the court denied the *Wheeler* motion. Unlike *People* v. *Hall, supra,* 35 Cal.3d 161, here there is nothing suggesting that the court misunderstood its obligation to evaluate the prosecutor's explanations. In *Hall* the court indicated hostility to the *Wheeler* holding, stating " 'a peremptory challenge is a peremptory challenge, otherwise, it's meaningless.' " (*Id.* at p. 165.) The trial court in *Hall* completely abdicated its responsibility under *Wheeler* and expressed the view that "group bias is shown only when a prosecutor declares an intent to exclude all members of an ethnic group from the jury." (*Id.* at p. 169.) Here, by contrast, the trial court's statement of the basis of a *Wheeler* motion indicated a clear understanding of the distinction between group bias and individual bias, and its explanation of its ruling shows that it found that the challenges had been based on an individual evaluation of each juror and his individual bias. The court thus understood its obligations under *Wheeler* and made a conscientious determination that the prosecutor had not been guilty of group bias.

The dissent's argument to the contrary is unconvincing. First, it rejects a number of reasons given by the prosecutor as being "trivial." Nowhere does *Wheeler* or *Batson* say that trivial reasons are invalid. What is required are reasonably specific and neutral explanations that are related to the particular case being tried. Second, the dissent dismisses a number of statements about particular jurors' dislike of the death penalty on the ground that further questioning revealed such jurors would vote for the death penalty if it were appropriate. Those answers, however, merely ruled out a challenge

for cause; they did not preclude concern that the jurors were predisposed against the death penalty.[4] The dissent's argument in this regard suggests that it has essentially elevated peremptory challenges to challenges for cause. In so doing, the dissent appears to embrace Justice Marshall's concurring opinion in *Batson,* which advocates the elimination of peremptory challenges. Justice Marshall was alone in this view, and it has never found explicit acceptance in our opinions.

We cannot argue with the assertion by defendant and the dissent that the prosecutor's explanations would be inadequate under the approach taken by the majority in *People* v. *Trevino* (1985) 39 Cal.3d 667 [217 Cal.Rptr. 652, 704 P.2d 719]. We think, however, that *Trevino* extended *Wheeler* beyond its logical limits.[5] Despite its professed confidence in the ability of trial judges to distinguish a true case of group discrimination, the majority in *Trevino* specifically disallowed reliance on body language and the prospective juror's mode of answering questions in rebutting a prima facie case. *Wheeler* had given no indication that such subjective reasons were unacceptable, and the dissent does not really argue to the contrary. (See dis. opn., p. 1284.) In ruling out subjective reasons, the majority in *Trevino,* and the dissent in this case, seem unwilling to trust the trial courts to conscientiously rule on the adequacy of the proffered explanations. As Justice Kaus wrote in dissent: "I have my own hunch that what is really behind the majority's rejection of hunches, gut-feelings and body language is a fear that prosecutors will insincerely attempt to justify group bias with such reasons and that trial judges, some of whom are perceived as being unsympathetic toward the *Wheeler* rule, will rubber-stamp their explanations. I submit that if we cannot trust trial courts to do their job fairly, we might as well close up shop and that we, ourselves, were insincere when, in *Wheeler,* we professed our faith in the 'good judgment' of the trial bench."[6] (*People* v. *Trevino, supra,* 39 Cal.3d at p. 704, fn. 4.)

---

[4]Indeed, the defendants, as part of their *Wheeler* motion, argued that jurors who had a "general opposition to the death penalty, [although] obviously still death qualified under the *Hovey* and *Witherspoon* decision," constituted a cognizable class and they objected to the prosecutor's use of peremptory challenges to exclude these "death penalty skeptics." Included as members of this group, we note, defendants named one of the Black jurors (Mrs. T.), two of the Jewish jurors (Ms. S. and Mr. B.) and one of the Asian jurors (Ms. F.), thus indicating defendants' belief that these jurors were in fact "death penalty skeptics." As indicated hereafter, we have previously upheld the right to peremptorily challenge death penalty skeptics. (See *post,* at p. 1223.)

[5]Our discussion focuses on *Wheeler* since it has gone further than *Batson* in allowing defendant to challenge the exclusion of groups of which he is not a member.

[6]The trial judge in this case had almost 10 years of judicial experience in supervising jury trials when this case was tried. Moreover, trial judges know the local prosecutors assigned to their courts and are in a better position than appellate courts to evaluate the credibility and the genuineness of reasons given for peremptory challenges.

The majority in *Trevino,* in our view, also placed undue emphasis on comparisons of the stated reasons for the challenged excusals with similar characteristics of nonmembers of the group who were not challenged by the prosecutor. First, we note, as did Justice Kaus in his *Trevino* dissent, that the comparison is one-sided since it ignores the characteristics of the other 26 jurors against whom the prosecutor also exercised peremptory challenges. (*Trevino, supra,* 39 Cal.3d at p. 700.) Moreover, we fail to see how a trial judge can reasonably be expected to make such detailed comparisons mid-trial. Here, with a two-month voir dire it is unrealistic to expect the trial judge to make a detailed review of the reasons as the *Trevino* majority would require.

The dissent's use of a comparison analysis to evaluate the bona fides of the prosecutor's stated reasons for peremptory challenges does not properly take into account the variety of factors and considerations that go into a lawyer's decision to select certain jurors while challenging others that appear to be similar. Trial lawyers recognize that it is a combination of factors rather than any single one which often leads to the exercise of a peremptory challenge. In addition, the particular combination or mix of jurors which a lawyer seeks may, and often does, change as certain jurors are removed or seated in the jury box. It may be acceptable, for example, to have one juror with a particular point of view but unacceptable to have more than one with that view. If the panel as seated appears to contain a sufficient number of jurors who appear strong-willed and favorable to a lawyer's position, the lawyer might be satisfied with a jury that includes one or more passive or timid appearing jurors. However, if one or more of the supposed favorable or strong jurors is excused either for cause or peremptory challenge and the replacement jurors appear to be passive or timid types, it would not be unusual or unreasonable for the lawyer to peremptorily challenge one of these apparently less favorable jurors even though other similar types remain. These same considerations apply when considering the age, education, training, employment, prior jury service, and experience of the prospective jurors.

It is also common knowledge among trial lawyers that the same factors used in evaluating a juror may be given different weight depending on the number of peremptory challenges the lawyer has at the time of the exercise of the particular challenge and the number of challenges remaining with the other side. Near the end of the voir dire process a lawyer will naturally be more cautious about "spending" his increasingly precious peremptory challenges. Thus at the beginning of voir dire the lawyer may exercise his challenges freely against a person who has had a minor adverse police contact and later be more hesitant with his challenges on that ground for fear that if he exhausts them too soon, he may be forced to go to trial with a juror who exhibits an even stronger bias. Moreover, as the number of

challenges decreases, a lawyer necessarily evaluates whether the prospective jurors remaining in the courtroom appear to be better or worse than those who are seated. If they appear better, he may elect to excuse a previously passed juror hoping to draw an even better juror from the remaining panel.

It should be apparent, therefore, that the very dynamics of the jury selection process make it difficult, if not impossible, on a cold record, to evaluate or compare the peremptory challenge of one juror with the retention of another juror which on paper appears to be substantially similar. The dissent's attempt to make such an analysis of the prosecutor's use of his peremptory challenges is highly speculative and less reliable than the determination made by the trial judge who witnessed the process by which the defendant's jury was selected. It is therefore with good reason that we and the United States Supreme Court give great deference to the trial court's determination that the use of peremptory challenges was not for an improper or class bias purpose. ■ As stated in *Batson*: "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." (*Batson* v. *Kentucky, supra,* 476 U.S. at p. 98, fn. 21 [90 L.Ed.2d at p. 89].) ■ Here an experienced trial judge saw and heard the entire voir dire proceedings by which defendant's jury was selected. The record indicates he was aware of his duty under *Wheeler* to be sensitive to the manner in which peremptory challenges were used. He found no improper use of the peremptory challenges by the prosecutor. Under these circumstances we see no good reason to second-guess his factual determination.[7]

Accordingly, we disapprove *People* v. *Trevino, supra,* 39 Cal.3d 667, to the extent it is inconsistent with this opinion. We hereby return to a standard of truly giving great deference to the trial court in distinguishing bona fide reasons from sham excuses. The United States Supreme Court echoed our view in this regard when it stated in *Batson*: "While we respect the views expressed in Justice Marshall's concurring opinion concerning prosecutorial and judicial enforcement of our holding today, we do not share them. The standard we adopt under the Federal Constitution is designed to ensure that a State does not use peremptory challenges to strike any black juror because of his race. We have no reason to believe that prosecutors will not fulfill their duty to exercise their challenges only for legitimate purposes. Certainly, this Court may assume that trial judges, in supervising *voir dire* in light of our decision today, will be alert to identify a prima facie case of purposeful discrimination. Nor do we think that this historic trial prac-

---

[7] We note, moreover, that there was in fact some racial diversity in this jury. Three of the jurors had Hispanic surnames, and one of these persons, Luis Reguero, served as the foreperson.

tice, which long has served the selection of an impartial jury, should be abolished because of an apprehension that prosecutors and trial judges will not perform conscientiously their respective duties under the Constitution." (*Batson* v. *Kentucky, supra,* 476 U.S. at p. 99, fn. 22 [90 L.Ed.2d at p. 89].)

Under the standard of giving great deference to the trial court's determination, we affirm the ruling in this case. The dissent, in our view, unjustly faults the trial court for not making a sincere and reasoned determination regarding the genuineness of the prosecutor's reasons. There is no indication in the record that the court did not do so. The dissent seems to believe that inquiry by the court is required to demonstrate compliance with its obligation under *Wheeler.* We do not read *Wheeler* or *Hall* as establishing such a requirement. The dissent also misinterprets a remark by the trial court as indicating that the court had determined in advance that it would accept as true anything the prosecutor said. The court simply rejected the defense argument of the necessity for placing the prosecutor under oath before hearing his reasons. The court's remark cannot reasonably be interpreted as anything more than that. Although the court's explanation of its ruling was inartfully phrased, the record clearly reveals that the court understood the distinction between specific and group bias and had that distinction in mind when it made its ruling.

■ Defendant finally contends that the prosecutor's use of peremptory challenges against death penalty skeptics violated *People* v. *Wheeler, supra,* 22 Cal.3d 258. We recently rejected that argument in *People* v. *Miranda, supra,* 44 Cal.3d at page 80. (See also *People* v. *Turner* (1984) 37 Cal.3d 302, 313-315 [208 Cal.Rptr. 196, 690 P.2d 669].)

B. *Peremptory Challenges.*

■ Defendant contends that section 1070.5, which limits jointly tried capital codefendants to 5 individual and 26 joint peremptory challenges, but gives the prosecutor 36 unrestricted challenges, operated to deny him due process and equal protection of the law because his codefendant was not "realistically" exposed to the death penalty and thus had different interests. We have recently upheld the statute against virtually identical attacks based on denial of due process and equal protection. (*People* v. *Miranda, supra,* 44 Cal.3d at pp. 79-80; *People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1004-1007 [248 Cal.Rptr. 568, 755 P.2d 1017].) Contrary to defendant's assertion, his situation is no different from that in *Ainsworth* where both defendants were charged with murder with special circumstances and there was no indication that the death penalty was not being sought as to the codefendant. Indeed, the *Ainsworth* situation was arguably more extreme in that each

defendant there attempted to cast primary blame on the other. Here, by contrast, both defendants claimed they were not involved in the crimes.

C. *Impartial Jury.*

■ Defendant contends that the death-qualification of the jury resulted in a guilt-prone jury which denied him his due process and impartial jury rights. We have repeatedly rejected that contention. (See e.g., *People v. Chavez* (1985) 39 Cal.3d 823, 827 [218 Cal.Rptr. 49, 705 P.2d 372]; *People v. Anderson* (1985) 38 Cal.3d 58, 60 [210 Cal.Rptr. 777, 694 P.2d 1149]; *People v. Easley* (1983) 34 Cal.3d 858, 868-869 [196 Cal.Rptr. 309, 671 P.2d 813].)

D. *Witherspoon/Witt.*

■ Defendant contends that three prospective jurors were improperly excused under *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. The United States Supreme Court, however, recently modified the *Witherspoon* standard in *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], and we adopted that modification in *People v. Ghent* (1987) 43 Cal.3d 739, 767-769 [239 Cal.Rptr. 82, 739 P.2d 1250]. The new standard is whether a juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." (469 U.S. at p. 424 [83 L.Ed.2d at pp. 851-852].) In addition to dispensing with *Witherspoon*'s reference to "automatic" decisionmaking, this new standard likewise does not require that a juror's bias be proved with "unmistakable clarity." The court explained that "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." (*Ibid.* [83 L.Ed.2d at p. 852].) ■ Our task on review is to examine the context surrounding the juror's exclusion to determine whether the trial court's decision that the juror's beliefs would "substantially impair the performance of his duties as a juror" is fairly supported by the record. (*Darden v. Wainwright* (1986) 477 U.S. 168, 175 [91 L.Ed.2d 144, 154, 106 S.Ct. 2464, 2469].)

■ Our review of the record discloses support for the court's determination that the three prospective jurors had views that would substantially impair the performance of their duties as jurors.

■ Defendant also argues that the excusals were improper because the trial court should have instructed the prospective jurors during voir dire that it was their civic duty to sit as jurors if they could subordinate their

views and obey the laws of this state. We rejected a similar claim in *People v. Miranda, supra,* 44 Cal.3d at page 96.

### E. *Defense Challenges for Cause.*

■■■ Defendant contends the court erred in denying his challenges for cause to three potential jurors for bias in favor of the death penalty. Defendant is correct in asserting that the same *Witherspoon/Witt* standard should govern such challenges. We so held in *People v. Coleman* (1988) 46 Cal.3d 749, 763-764 [251 Cal.Rptr. 83, 759 P.2d 1260]. Although each of the jurors in question indicated that he favored the death penalty, each ultimately said that he would follow the law as given and would not automatically vote for the death penalty. Each juror indicated he would vote for life without possibility of parole if that were the appropriate penalty based on the evidence presented. The court rejected defense counsel's argument that these jurors had said they would place the burden on the defendant to show why the death penalty should not be given, noting that defense counsel had elicited such statements in response to leading questions which did not explain the requirements of the law. Once informed of the legal standard the jurors said they would follow it.

■■■ The record supports the trial court's ruling. Where, as here, conflicting and equivocal answers are given regarding the juror's impartiality, the trial court's determination as to the juror's true state of mind is binding upon an appellate court. (See *People v. Fields, supra,* 35 Cal.3d at pp. 355-356; *People v. Floyd* (1970) 1 Cal.3d 694, 725 [83 Cal.Rptr. 608, 464 P.2d 64].)

### F. *Restriction of Voir Dire.*

■■■ Defendant contends the trial court abused its discretion under *People v. Williams* (1981) 29 Cal.3d 392 [174 Cal.Rptr. 317, 628 P.2d 869] in refusing to permit defense counsel to question prospective jurors regarding their ability to view accomplice Hodges's testimony with suspicion and distrust. We disagree. ■■■ In *Williams* we held that counsel should be allowed to ask questions reasonably designed to assist in the intelligent exercise of peremptory challenges whether or not such questions are also likely to uncover grounds for a challenge for cause. (*Id.* at p. 407.) We reaffirmed, however, that the function of voir dire is not to educate or indoctrinate the jury. (*Id.* at p. 408.) We also left "intact the considerable discretion of the trial court to contain voir dire within reasonable limits." (*Ibid.*)

Under *Williams* the court must permit questioning about legal doctrines that are material to the trial and controversial in the sense that they are

likely to invoke strong feelings and resistance to their application. (29 Cal.3d at p. 410; *People v. Balderas* (1985) 41 Cal.3d 144, 184 [222 Cal.Rptr. 184, 711 P.2d 480].) ██ Under this standard the court acted within its discretion in precluding questions about viewing accomplice testimony with distrust since that is not a proposition with which the average juror would tend to disagree. (See *People v. Balderas, supra,* 41 Cal.3d at p. 184; see also *People v. Helton* (1984) 162 Cal.App.3d 1141, 1144-1145 [209 Cal.Rptr. 128].)

██ Defendant also contends the court abused its discretion in precluding or limiting defense questioning of prospective jurors as to factors and circumstances they would deem significant in selecting an appropriate penalty. Again we find no abuse of discretion. The line of questioning involved incomplete statements of law and tended to cause confusion about the legal principles and facts of the case. This was unlike the questioning improperly precluded in *Williams* regarding the jurors' views about the right to use force in self-defense even though an avenue of retreat is open. In the present case, the court permitted a wide range of questions regarding prospective jurors' attitudes about the death penalty, and it did not abuse its discretion in imposing this limitation.

██ Defendant further contends that the court improperly precluded the defense from questioning jurors with prior jury experience about the result reached by the prior jury. In *People v. Murtishaw* (1981) 29 Cal.3d 733, 765-767 [175 Cal.Rptr. 738, 631 P.2d 446], we held that in future cases a trial judge will have the discretionary authority to permit defense access to jury records and reports of investigations available to the prosecution. Defendant concedes that *Murtishaw* was inapplicable to his case since voir dire commenced four days before *Murtishaw* was filed, but he nevertheless argues that the trial court should have permitted the questioning of jurors under the *Williams* rule. The effect of *Williams* on the long-standing rule precluding such questions (*People v. Conte* (1912) 17 Cal.App. 771, 778 [122 P. 450]; *People v. Trask* (1907) 7 Cal.App. 103, 105 [93 P. 891]) appears to be an open question. We need not decide it here, however, since even if it were error to preclude such questioning, the error was clearly harmless. As we stated in *People v. Murtishaw, supra,* 29 Cal.3d at page 767: "As the prior cases have pointed out, in any individual case it *is* entirely speculative whether denial of access [to jury records] caused any significant harm to the defense. Consequently, under the test of prejudice established in the California Constitution (art. VI, § 13) and *People v. Watson* [1956] 46 Cal.2d 818, 836 [299 P.2d 243], the denial of access is not reversible error."

## III. Guilt Phase Issues

### A. *Motion to Suppress Testimony of Accomplice Hodges.*

 Defendant contends the court erred in denying his motion to suppress the testimony of Hodges on the ground that it was the product of illegal interrogation. It is undisputed that statements made by Hodges on December 5 and December 9, 1980, were involuntary as a result of having been obtained through coercion and other illegal means.[8] These statements were near-confessions and implicated defendant and Fields. The trial court, however, found there was clear and convincing evidence of attenuation and therefore refused to suppress Hodges's testimony.

 In reviewing this contention using well-settled principles, we state the facts in the manner most favorable to the trial court's determination, resolving conflicts in the evidence in favor of the findings below. (*People* v. *Superior Court* (*Sosa*) (1982) 31 Cal.3d 883, 887 [185 Cal.Rptr. 113, 649 P.2d 696].)

It is unnecessary to go into detail about the many illegalities in obtaining Hodges's statements. For our purposes of reviewing the trial court's ruling on attenuation it is sufficient to note that the trial court found, and the prosecution did not dispute, that the statements given by Hodges to Sergeant Pang were involuntary for the following reasons: "There wasn't probable cause to arrest. During the course of the interrogations there were both promises of reward or leniency. There were coercions threatening the defendant that if he didn't talk they would go all the way on the prosecution, where they didn't have evidence to proceed. [¶] There was pressure regarding out-of-county crimes and misrepresentations regarding the status of those offenses. Mr. Hodges was misled regarding those matters. [¶] And also there was pressure brought to bear on his girlfriend, Miss Elarms, before Mr. Hodges was allowed to talk to her regarding the status of those particular cases. And there was a threat there, and on the instant charge to act in a certain way, the officers knew that they didn't have probable cause. [¶] There was also a clear violation of *Miranda*, and although that is not something that may be directly assertable here by defendants Johnson and Fields, it's certainly a fact that the Court has to consider in the context of all the circumstances. This is just a partial statement of the reasons for my decision in that regard."

---

[8] Defendant has standing to raise the issue of the voluntariness of Hodges's statements since they were obtained through coercive means. (See *People* v. *Varnum* (1967) 66 Cal.2d 808, 812-813 [59 Cal.Rptr. 108, 427 P.2d 772]; *People* v. *Jones* (1980) 105 Cal.App.3d 572, 581 [164 Cal.Rptr. 605].)

On the question of attenuation, Hodges testified that his decision to testify was based on his fear that his confessions would be admissible. The force of this testimony, however, was dissipated by other evidence in the record. At the time of Hodges's preliminary hearing on the Dukar robbery/murder charges, it was stated that Hodges would waive preliminary examination, and in exchange for a plea bargain, would testify in the matters involving defendant and Fields. During the voir dire regarding the plea bargain it was stated that Hodges would plead guilty to a charge of simple robbery carrying a prison term of two, three or five years. Hodges acknowledged that his attorney had explained that the statements he had given to the police "may very well be inadmissible evidence." Hodges also acknowledged that he understood that without the statements there would be insufficient evidence to hold him. At the point of taking Hodges's waivers on the plea bargain, Hodges began to balk. The hearing was then recessed. Hodges and his attorney met with the prosecutor who offered to reduce the maximum sentence on the robbery plea to three years. During this meeting Hodges's attorney said, "You've made your decision. You've made it in open court. The statements are ridiculous. We'll go ahead and go to prelim. If the statements are thrown out I'm aware of no evidence against you. . . ." Hodges then decided to accept the prosecutor's offer of the reduced sentence and to go forward with the agreement.

 In finding clear and convincing evidence of attenuation, the court cited a number of factors: In the intervening 10 days between the time Hodges made his statements and the preliminary hearing there was no further contact between Hodges and the police. The record of Hodges's preliminary hearing waiver indicated Hodges had been advised of the possibility of his statements being ruled inadmissible and the lack of evidence against him without those statements. Hodges's balking at the initial waiver and his decision to continue after the prosecutor's offer of a reduced sentence indicates an arm's length bargain. All of this evidenced that Hodges's decision to go ahead was an exercise of his free will and was not a consequence of any further exploitation of the initial confessions. The court also noted that Hodges's testimony that his attorney had told him the statements may be admissible must be put in the context of the way lawyers speak about the outcome of litigation—i.e., there are no guaranties.

We conclude the record supports the trial court's ruling. As the trial court noted, the circumstances here are unlike those in *People* v. *Superior Court (Sosa)*, *supra,* 31 Cal.3d 883, upon which defendant relies. In *Sosa* we affirmed the trial court's suppression of a witness's testimony on the ground that there was no credible evidence of attenuation. The only evidence offered at all was testimony by a police officer which the court refused to credit. There was no evidence that the witness was exercising his free will in

deciding to testify. Here, by contrast, there was ample and credible evidence of attenuation. (See also *United States* v. *Ceccolini* (1978) 435 U.S. 268 [55 L.Ed.2d 268, 98 S.Ct. 1054].)

 Defendant also contends he was denied due process by the trial court's rulings that the attorney-client privilege precluded most of his questions to Hodges and his attorney regarding the content of their discussion about the plea bargain and the admissibility of the statements. Defendant argues that Hodges waived the attorney-client privilege when, in response to a question by the prosecutor about the meeting at which the prosecutor was present, Hodges said that his attorney had told him earlier that there was a possibility his statements would be admissible because it was a murder-robbery. After lengthy argument the court ultimately ruled that Hodges had not made a general waiver of the attorney-client privilege because he had not been advised of his right to assert the privilege. The court also ruled that the conversation at which the prosecutor was present was not privileged because it was not intended to be confidential. In accord with this ruling, Hodges's attorney testified about the meeting with the prosecutor, but the court sustained objections to questions about other discussions between him and Hodges.

Although defendant makes a lengthy argument concerning his due process rights to invade the attorney-client privilege, he cites no authority directly supporting that claim. Indeed, *Littlefield* v. *Superior Court* (1982) 136 Cal.App.3d 477 [186 Cal.Rptr. 368], supports a contrary result. There the Court of Appeal reversed the trial court's order allowing defendant Angelo Buono to invade prosecution witness Kenneth Bianchi's attorney-client privilege regarding conversations with his attorney leading to his plea bargain: "The contention herein urged on us is that the evidence sought would show that the public defender, then representing Bianchi, had disclosed to Bianchi facts about the alleged murders, thus enabling him to fabricate testimony against Buono. Assuming that the evidence would show that the public defender had done so, in counseling Bianchi about the wisdom of the plea bargain (a fact that Buono's counsel can only surmise), we see nothing to permit a violation of the traditional attorney-client privilege." (*Id.* at p. 481.) The same reasoning applies in this case.

B. *Testimony by Hodges Pursuant to Plea Bargain.*

 Defendant contends he was denied a fair trial because the terms of Hodges's plea bargain placed him under a strong compulsion to testify in accordance with his prior statements to the police. Defendant relies primarily on *People* v. *Medina* (1974) 41 Cal.App.3d 438 [116 Cal.Rptr. 133], where the Court of Appeal reversed the convictions of two defendants after

prosecution witnesses testified under a grant of immunity conditioned upon the witnesses not changing their testimony from the tape-recorded statements given the police. (*Id.* at p. 450.) The court acknowledged that a grant of immunity could be conditioned on a requirement that the witness testify fully and fairly to the facts, but that it was not permissible to place the witness under a strong compulsion to testify in a particular fashion. (*Id.* at p. 455.)

In the present case, the terms of the plea bargain required that Hodges testify truthfully if called as a witness at the preliminary hearing and trial of defendant and Fields. Hodges's attorney stated that the agreement contemplated truthful testimony and was not conditioned upon testimony "for or against anyone." The prosecutor interjected at that point: "And further, it's also conditioned of course, on the understanding that what he has told the Milpitas Police Department in previous statements is in fact the true testimony that he—as he understands it—"

The present situation is not like that in *Medina*. Here the agreement was that Hodges testify truthfully. The prosecutor's assertion that he understood the truth to be what Hodges had told the police was not a term of the bargain. We considered a similar situation in *People* v. *Fields, supra,* 35 Cal.3d at pages 360-361, and rejected the defendant's claim that the bargain was tainted by the prosecutor's expectation of testimony consistent with the statement given to the police: "We recognize that a witness in Gail Fields' position is under some compulsion to testify in accord with statements given to the police or the prosecution. The district attorney in the present case obviously believed that Gail's last statement was a truthful account, and if she deviated materially from it he might take the position that she had breached the bargain, and could be prosecuted as a principal to murder. But despite this element of compulsion, it is clear, and the cases so hold [citation] that an agreement which requires only that the witness testify fully and truthfully is valid, and indeed such a requirement would seem necessary to prevent the witness from sabotaging the bargain." (*Id.* at p. 361; accord *People* v. *Allen* (1986) 42 Cal.3d 1222, 1251-1255 [232 Cal.Rptr. 849, 729 P.2d 115].)

C. *Motion to Sever.*

Defendant contends the trial court erred in denying his motion to sever his trial from that of codefendant Fields. The motion was based on the prejudicial effect of admission of codefendant Fields's extrajudicial statement (see *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]) and the requirement that codefendants share peremptory challenges (§ 1070.5).

Section 1098 states the general preference for joint trials: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials. . . ." The matter of granting separate trials "remains largely within the discretion of the trial court [citation], guided by the principles set out in *People* v. *Massie* (1967) 66 Cal.2d 899 [59 Cal.Rptr. 733, 428 P.2d 869]." (*People* v. *Turner, supra,* 37 Cal.3d 302, 312.) The court should order separate trials of codefendants "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." (*People* v. *Massie, supra,* 66 Cal.2d 899, 917, fns. omitted.)

 No abuse of discretion appears here. The court's denial of severance was premised on an effective editing of codefendant Fields's statement or exclusion of the statement if effective editing were not possible. That took care of any *Aranda* problems. (See *People* v. *Aranda, supra,* 63 Cal.2d 518.) As to the claimed prejudice of having to share peremptory challenges, the court properly relied on the statute providing for shared peremptory challenges in joint trials. (§ 1070.5.) None of the other factors mentioned in *Massie, supra,* 66 Cal.2d 899, was present here. There was no indication that there would be conflicting defenses or the possibility of exonerating testimony if the trials were separate. Nor was there any indication of undue prejudice from the association of the two defendants. Finally, the charges were essentially the same as to each and not likely to cause confusion. The codefendants' positions in this case were less adversarial than those in *People* v. *Turner, supra,* 37 Cal.3d 302, where we affirmed the ruling denying separate trials when the defendants had conflicting defenses.

D. *Introduction of Fields's Statement.*

1. *Aranda.*

 Defendant contends that the admission of a heavily edited version of Fields's extrajudicial statement violated *People* v. *Aranda, supra,* 63 Cal.2d 518 and *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]. *Aranda* allows admission of a codefendant's extrajudicial statement in a joint trial only if all parts of the statement which implicate any codefendants are effectively deleted: "By effective deletions, we mean not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established." (*People* v. *Aranda, supra,* 63 Cal.2d at p. 530.)

The edited statement of Fields that was admitted was extremely limited—that Fields had told Sergeant Pang that he had gone into Dukar's store about noon and was wearing a light color suit. The court gave an instruction that the jury was to consider this evidence against Fields only.

Defendant argues that this statement indirectly implicated him because it tended to corroborate Hodges's testimony as well as the identifications made by a number of eyewitnesses. *Aranda* protections, however, do not go that far. Fields's statement did not link defendant to the crime any more or less than he was already linked. The statement is similar to that which the court in *Aranda* indicated would have been acceptable: "I was one of the persons who robbed the store but I will tell you nothing more." (63 Cal.2d at p. 531, fn. 10.) (See also *People* v. *Dominguez* (1981) 121 Cal.App.3d 481, 506-507 [175 Cal.Rptr. 445].)

2. *Tainted Fruit.*

Defendant contends that Fields's statement was also inadmissible as a fruit of the illegal arrest and the illegal statements given by Hodges. In reviewing the trial court's ruling denying the motion to suppress this evidence, we state the facts in the manner most favorable to the trial court's determination and resolve conflicts in the evidence in favor of the finding below. (*People* v. *Superior Court (Sosa), supra,* 31 Cal.3d at p. 887.)

Based on Hodges's statements on December 5 and 9, Officer Pang obtained a warrant for Fields's arrest. On December 29, 1980, Officer Templeman of the Alhambra Police Department detained Fields and ran a warrant check which revealed outstanding traffic warrants. About the same time, Templeman's supervisor arrived and told him Fields was wanted for murder. They took Fields to the police station on the traffic warrants and called Officer Pang to verify the murder warrant. There was a discrepancy in the warrant about the race of the person wanted, and Pang confirmed the wanted person was Black. Officer Pang told Templeman that Hodges had implicated Fields at a preliminary hearing and that there was "plenty of probable cause" to arrest him. Although there was some dispute about whether Officer Pang told Templeman to arrest Fields on the warrant or on the basis of Hodges's testimony at the preliminary hearing, the trial court found that Pang's reference to Hodges's preliminary hearing testimony and statement that there was "plenty of probable cause" supported the legality

of the arrest. We defer to the trial court's finding in this regard and conclude that its ruling must be upheld.[9]

E. *Testimony by Gary Ingalls.*

 Defendant contends the court prejudicially erred in admitting the testimony of Gary Ingalls because he had been hypnotized. (See *People* v. *Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 641 P.2d 775]; *People* v. *Guerra* (1984) 37 Cal.3d 385 [208 Cal.Rptr. 162, 690 P.2d 635].) After hearing evidence and argument the court ruled that Ingalls's testimony was admissible because he had not in fact been hypnotized. Defendant disputes the trial court's ruling.

Gary Ingalls, the store clerk, gave the police a report on the day of the robbery. On November 18, 1980, Ingalls was taken to a hypnotist, Mr. Fernandez, to see if he could remember additional details. After the session Ingalls did not have any different recollection and did not believe he had been hypnotized. Mr. Fernandez, however, was of the opinion that Ingalls had been hypnotized. On August 4, 1981 (nine months after the session with Mr. Fernandez), Ingalls was examined by Dr. David Spiegel, a psychiatrist. After interviewing Ingalls and Fernandez, listening to a tape of the session, reviewing police reports containing Ingalls's statement, and administering a hypnotic induction profile, Dr. Spiegel concluded Ingalls had not in fact been hypnotized. Dr. Spiegel attached particular significance to Ingalls's use of both past and present tense on the tape since hypnotized subjects usually use the present tense as though reliving the experience.

Defendant contends that the court's ruling was erroneous because it was based on the opinion of Dr. Spiegel, which in turn was based on the results of the hypnotic induction profile. He asserts that the court should have disregarded Dr. Spiegel's opinion because the hypnotic induction profile did not meet the *Kelly-Frye* standard of general acceptance as reliable in the scientific community in which it was developed. (*People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013 [54 App.D.C. 46, 34 A.L.R. 145].) Defendant did not raise this objection until the time of the trial court's ruling. In any event, the argument is unavailing since the hypnotic induction profile was not the sole basis of Dr. Spiegel's opinion, and Dr. Spiegel's opinion was not the sole basis of the trial court's ruling. The court based its ruling on the testimony of Ingalls himself as well as Dr. Spiegel. Dr. Spiegel, in turn, based his opinion on review of the tape recording of the hypnosis session,

---

[9] Even if the ruling were erroneous, we would have no difficulty finding the admission of the heavily edited version of Fields's statement harmless beyond a reasonable doubt.

police reports regarding Ingalls's statement, and the hypnotic induction profile.

F. *Hitch/Trombetta Motion.*

██ ██ Defendant contends the trial court erred in denying the motion to exclude fingerprint evidence and testimony regarding some rings under *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361]. In *Hitch,* we held there is a due process duty to preserve and disclose the component parts of a breathalyzer test and that where such evidence cannot be disclosed because of its intentional but nonmalicious destruction, suppression of the test results is required unless the prosecution can show that the investigative officials have established and enforced rigorous and systematic procedures for the preservation of the evidence. (*Id.* at pp. 652-653.) We ruled that the People's duty to preserve applies whenever there exists a "reasonable possibility" that the evidence would have constituted "favorable evidence on the issue of guilt or innocence." (*Id.* at p. 649.) We later applied *Hitch* to require the preservation of a semen sample taken from a rape victim (*People* v. *Nation* (1980) 26 Cal.3d 169 [161 Cal.Rptr. 299, 604 P.2d 1051]) and of a urine sample taken from a suspected narcotics user (*People* v. *Moore* (1983) 34 Cal.3d 215 [193 Cal.Rptr. 404, 666 P.2d 419]).

In *California* v. *Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528], the United States Supreme Court addressed for the first time the question of the People's duty under the due process clause of the Fourteenth Amendment to take affirmative steps to preserve evidence. ██ Although the high court discussed our *Hitch* case, it formulated its own test: "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (467 U.S. at pp. 488-489 [81 L.Ed.2d at p. 422], fn. omitted.)

Although we have acknowledged that the *Trombetta* formulation of the duty-to-preserve test differs substantially from our *Hitch* standard (*supra,* 12 Cal.3d 641), we have never squarely decided whether *Hitch* has "survived" *Trombetta*. (See *In re Michael L.* (1985) 39 Cal.3d 81, 86 [216 Cal.Rptr. 140, 702 P.2d 222].) The Court of Appeal, however, was forced to decide this question in *People* v. *Trombetta* (1985) 173 Cal.App.3d 1093 [219 Cal.Rptr. 637] where upon remand of the case from the United States Supreme Court, it held that *California* v. *Trombetta* supersedes *Hitch*. The

*People* v. *Trombetta* court concluded that *Hitch* was premised on federal due process and that the federal due process test set forth in *California* v. *Trombetta* should therefore prevail. (173 Cal.App.3d at p. 1100.) Although we agree with that analysis of our *Hitch* opinion, we note that there is yet another reason for finding the *Trombetta* rule controlling. As Justice Eagleson noted in *People* v. *Angeles* (1985) 172 Cal.App.3d 1203 [218 Cal.Rptr. 756], the result is also compelled by the Truth-in-Evidence provision of Proposition 8, which added article I, section 28, subdivision (d) to the California Constitution.[10]

Justice Eagleson found the *Hitch* exclusionary rule governed by the reasoning set forth in *In re Lance W.* (1985) 37 Cal.3d 873, 888-889 [210 Cal.Rptr. 631, 694 P.2d 744], that article I, section 28, subdivision (d) has limited the power of the court to create nonstatutory rules for the exclusion of unlawfully seized evidence if those rules afford greater protection to a criminal defendant than does the Fourth Amendment. "In each instance relevant evidence on the issue of guilt or innocence is being excluded, and the reasoning of *In re Lance W.* should be applicable to both situations." (*Angeles, supra,* 172 Cal.App.3d at p. 1217; accord *People* v. *Tierce* (1985) 165 Cal.App.3d 256 [211 Cal.Rptr. 325].)

Based on the foregoing, we conclude that *Hitch, supra,* 12 Cal.3d 641, has not survived *Trombetta, supra,* 467 U.S. 479. Under the *Trombetta* standard we find no error.

1. *Fingerprint Evidence.*

The prosecution introduced evidence that defendant had been seen at Dukar's store holding a jewelry catalog and that a catalog found at the store after the murder had two fingerprints matching defendant's. An FBI fingerprint specialist, Thurman Williams, tested the catalog after local authorities had already tested it with ninhydrin and photographed the two fingerprints disclosed. Williams made his own photos of the fingerprints, which were sufficient for comparison purposes. Williams reprocessed the catalog with ninhydrin and then, following normal procedures, used silver nitrate to see if additional prints could be developed. No further prints were found; the silver nitrate turned the paper dark and washed out the latent prints. At the time he used the silver nitrate Williams did not know there were prints to be compared with those found on the catalog. He was later given a set of defendant's prints which he found matched the prints in photos he had taken; there were at least 15 points of similarity and no points of dissimilarity.

---

[10] We recognize, however, that Proposition 8 does not apply to this case since the crimes in question were committed before the passage of Proposition 8. (See *People* v. *Smith* (1983) 34 Cal.3d 251, 262 [193 Cal.Rptr. 692, 667 P.2d 149].)

In denying the motion to exclude the fingerprint evidence, the trial court stated that the fingerprint identification was made from the photographs of the latent prints and that those photographs still exist. The court also noted that it is standard procedure in analyzing fingerprints to do the silver nitrate test and to do it last.

The court's ruling was proper. The catalog did not have an exculpatory value that was obvious at the time of test, nor did it constitute the sole means of obtaining the evidence since the photographs taken of the fingerprints still exist. (See *California* v. *Trombetta, supra,* 467 U.S. at pp. 488-489 [81 L.Ed.2d at p. 422].)

2. *Ring Diagrams.*

On the day of the murder Gary Ingalls had prepared a diagram of two rings the killer had worn. One was a white gold ring with an L-shaped area with two or three diamonds worn on the left little finger. The other was a large diamond encircled by smaller diamonds. The diagrams were given to the police and were lost by them.

Defendant was wearing a diamond ring on his left small finger when he was arrested on November 18, 1980. Charles Ray said the ring defendant had been wearing could be the one he had seen on the killer's finger. Gary Ingalls said the ring defendant had been wearing looked similar to one he had seen the killer wearing. Ingalls gave conflicting testimony regarding the description of the non-L-shaped ring he had drawn. At one point he said he could not remember how he had described the second ring.

The trial court denied a motion to strike the testimony of other witnesses regarding the ring defendant was wearing when arrested, but it stated it would entertain a motion to strike the testimony of Ingalls as to that matter. The striking of Ingalls's testimony would have been sufficient to dispel any prejudice resulting from the loss of the diagrams. Defendant's failure to seek such relief, in our view, constitutes abandonment of the claim. (See *People* v. *Saddler* (1979) 24 Cal.3d 671, 684 [156 Cal.Rptr. 871, 597 P.2d 130].) In any event, defendant was still able to impeach Ingalls's testimony by having Officer Morasci duplicate in court the diagrams which had been lost. Moreover, the evidence pertaining to the rings was tangential at best since defendant could have changed rings many times in the two and a half weeks between the murder and his arrest. Thus, in *Trombetta* terms, the diagram could not be expected to have had a significant role in defendant's defense, and defendant was able to obtain comparable evidence by Officer Morasci's duplication of the diagram. *(California* v. *Trombetta, supra,* 479 U.S. at pp. 488-489 [81 L.Ed.2d at p. 422].)

### G. *Prosecutorial Misconduct.*

 Defendant contends the prosecutor committed misconduct in four instances.

1. He charges the prosecutor with *Griffin* error (*Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]) in stating during guilt phase argument: "Ladies and gentlemen, you have now heard the entirety of the case at least as it resolves to the defense in this case. Obviously, if there has been some or is some defense to this case, you'd either have heard it by now or for some reason nobody's talking about it."

 We do not believe that this statement constitutes impermissible comment on defendant's failure to testify at trial. (See *People* v. *Ratliff* (1986) 41 Cal.3d 675, 691 [224 Cal.Rptr. 705, 715 P.2d 665].) Moreover, defendant's failure to raise this objection below bars review since an admonition could have cured any conceivable prejudice. (*People* v. *Green* (1980) 27 Cal.3d 1, 27-34 [164 Cal.Rptr. 1, 609 P.2d 468].) Defendant's suggestion that the *Green* contemporaneous objection rule should not be followed in capital cases has been rejected in numerous cases. (See e.g., *People* v. *Ratliff, supra,* 41 Cal.3d at pp. 690-691; *People* v. *Miranda, supra,* 44 Cal.3d at p. 108, fn. 30.)

2. Defendant contends the prosecutor was calling his stepfather, Fred Ferguson, Sr., a liar and/or a fool in the following cross-examination of him regarding the pressure the prosecutor was putting on him: "A. I told you I didn't know what to do. Q. Right. A. And I said you got me on the spot, you said that's right. I'm supposed to get you on the spot. Q. *What a mind.* Do you remember me saying I'm supposed to get you on the spot?" (Italics added.)

The italicized statement by the prosecutor does not appear derisive, but even if it were, defendant's failure to object bars review under *Green* since an admonition clearly could have cured any prejudice.

3. Defendant complains about a statement made by the prosecutor during cross-examination of Frank Rodriguez who was testifying for codefendant Fields. Rodriguez had seen a Black man standing near Dukar's store minutes before the killing, but he was unable to identify either of the defendants as the man he had seen. The prosecutor asked Rodriguez whether his family was unhappy about his being a witness. The defense objected, stating: "May it please the Court, what his family's feelings may be are not material to this witness' voluntariness—. . . I mean, we can't cross-examine the family to find out why are they reluctant to have somebody come forward and at-

tempt to tell the truth as they see it." When asked by the court if he wished to respond, the prosecutor said: "*I'm afraid the response, Your Honor, wouldn't be something we should put on the record.*" (Italics added.)

Again, defendant's failure to object below bars review under *Green*. Contrary to defendant's assertion, it is not clear to us that the italicized statement implied the prosecutor knew some fact about the witness's family that would be damaging to the defense. Moreover, any prejudice to defendant would be extremely remote since the testimony related only to codefendant Fields.

4. Defendant further contends the prosecutor improperly stated his personal views. On the subject of the ease or difficulty of identifying defendant, the prosecutor said, "I'd recognize him anyplace." Regarding the defense fingerprint expert's being paid for his time, the prosecutor said, "I have some feelings about that." On the subject of the same witness's expertise, the prosecutor argued, "I won't call him an expert, but I don't think he was really qualified as one. . . ." The prosecutor expressed unhappiness about the leniency granted Hodges. Finally, the prosecutor stated that the jury must have seen defense witness Maxine Brown talking to defense counsel in the hallway during recess, implying, according to defendant, that her testimony was being doctored by the defense.

The only objections raised below were to the comment about the fingerprint expert's expertise and the leniency given Hodges. As to the former, the court admonished the jury to disregard the prosecutor's statement to the extent it was an expression of his personal opinion rather than his view of the evidence. As to the latter the court overruled the objection and it is difficult to see how defendant suffered any prejudice.

The court, on its own, admonished the jury to disregard the comment about Maxine Brown's meeting with defense counsel. Moreover, the remarks pertained to Brown's correction of her testimony after a recess in which she met with counsel, a fact which she herself confirmed.

As to the other unobjected-to statements, an admonition would have cured any prejudice; thus review of these points is barred. (*People* v. *Green, supra,* 27 Cal.3d at pp. 27-34.) In any event, any error was clearly nonprejudicial.

H. *Other Trial Errors.*

Defendant mentions in passing three other asserted errors which he urges cumulatively contributed to the verdict. ▮ He argues that the court

erred in sustaining hearsay objections to defense questions regarding the content of a conversation between members of the Ferguson family and Sergeant Pang. Pang had testified on direct that he had told the family the crime had occurred at 12:52 p.m. Hearsay objections were sustained when the defense attempted to elicit the responses of the family members when told the time of the crime. Contrary to defendant's assertion, these statements were not admissible under Evidence Code section 356 or 791. Section 356 applies when the balance of a conversation is necessary to make it understood. Section 791 applies to prior consistent statements to rebut a charge of recent fabrication. Neither statute fits the situation here.

■ Defendant next contends the court erred in sustaining hearsay objections to a question of Elaine Williams regarding where defendant said he was going. Before the court could rule, Williams responded: "Barry Ferguson was dressed like a woman, and he [defendant] was going to a Halloween party that's what I know because I was there." The court ordered the answer stricken. Even if the court erred in excluding testimony concerning where defendant said he was going, any error could not have been prejudicial in light of the other evidence that had been admitted regarding defendant's having gone to the party at the convalescent home.

■ Finally, defendant complains about Sergeant Pang's bringing to court a clear plastic bag that contained, among other things, a light blue-grey suit which had been ordered suppressed. When the suit's presence was noted, the court ordered it removed and found no prejudice. Defendant fails to show the court erred.

## IV. SPECIAL CIRCUMSTANCE ISSUES

*Intent to Kill.*

■ Defendant argues that the robbery/murder special circumstance should be set aside because the court failed to instruct on intent to kill in connection with it. (See *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862].) His contention fails. In *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], we reconsidered our *Carlos* decision in light of intervening authority from the United States Supreme Court. We concluded that the court need not instruct on intent to kill as an element of the felony-murder special circumstance unless there is evidence from which the jury could find that the defendant was an accomplice rather than the actual killer.[11] (*Id.* at pp. 1138-1139.)

---

[11] Defendant urges reexamination of *Anderson,* but the arguments he presents have all been made and rejected in the petition for rehearing in *Anderson.* (See also *People* v. *Poggi* (1988) 45 Cal.3d 306, 326-327 [246 Cal.Rptr. 886, 753 P.2d 1082].)

In the present case, there is no evidence that anyone other than defendant was the actual killer. Accordingly, we find the record establishes beyond doubt that defendant was the actual killer in this case, and hence the finding required by *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368], is satisfied. (*Cabana* v. *Bullock* (1986) 474 U.S. 376 [88 L.Ed.2d 704, 106 S.Ct. 689].)

## V. PENALTY PHASE ISSUES

### A. *Facts.*

#### 1. *Prosecution Case.*

The prosecution presented evidence of a number of other crimes committed by defendant. Ludmila Vystricil testified that defendant and another man robbed her at her jewelry store in Fremont on April 11, 1980. They took between $21,000 and $25,000 worth of jewelry. Ludmila's son, Carol Vystricil, testified that defendant, a woman, and another man robbed him of between $70,000 to $75,000 worth of jewelry at the Fremont jewelry store on August 18, 1980.

Robert Siegel, a St. Louis, Missouri, police officer testified that on January 11, 1969, in a St. Louis housing project, defendant and about five other young men pulled guns on him and his partner, took the officers' guns, ordered them to start running, and fired about five shots at them. A certified copy of defendant's conviction for first degree robbery for this offense was also introduced.

The prosecution introduced a certified copy of defendant's Missouri conviction on February 11, 1974, for manslaughter.

Emile Jones testified that on January 11, 1980, defendant and another man began shooting at him while he was trying to open the trunk of a car parked near the freeway in East Palo Alto.

Bessy Henderson testified that on April 17, 1980, her sister Cheryl Rayon, who was defendant's girlfriend, was staying with defendant at his mother's house. When defendant's sister would not let Bessy talk to Cheryl on the telephone, Bessy lied and left word that her mother was ill and that Cheryl should come home. When Cheryl and defendant arrived at Bessy's house about 10 minutes later, defendant became very angry upon learning that her mother's illness was just a ruse. Defendant pulled a gun and said that being lied to made him want to hurt someone.

## 2. *Defense Case.*

The only evidence defendant presented at the penalty phase was the testimony of Barcialee Barbarick, a 63-year-old inmate from Missouri who had spent 41 years in custody. He was then serving a life term in Missouri for murder. Barbarick testified that defendant had not been the person who had committed the Griffith killing on May 16, 1973. He was surprised that defendant had pled guilty to the offense (manslaughter) but that defendant was young, uneducated, and had been threatened with the death penalty.

## 3. *Prosecution Rebuttal.*

Santa Clara Deputy Sheriff Dan Aulman testified that he escorted Barbarick from Missouri and that Barbarick had said defendant was his best friend and that he would do anything to help him.

Robert Roller testified that he had been a prison guard at the time of the Griffith killing. He saw an unknown Black inmate hold Griffith while defendant stabbed him with a knife. Roller yelled at defendant. Defendant turned, pointed the knife at him, and said, "Don't fuck with me."

## B. *Notice of Aggravating Evidence.*

Defendant contends the prosecution violated the notice provisions of section 190.3 and that the trial court therefore erred in permitting evidence in aggravation to be introduced at the penalty trial. We disagree.

Section 190.3 provides in pertinent part: "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial." The purpose of the notice provision is to advise an accused of the evidence against him so that he may have a reasonable opportunity to prepare a defense at the penalty trial. (See *People* v. *Miranda, supra,* 44 Cal.3d at p. 96.)

Defendant asserts the notice was inadequate in this case because the written notice was not provided until one day after the jury was sworn and over sixty days after jury selection had begun. The trial court found, however, on two different occasions that the defense had had actual notice

well before any definition of commencement of trial.[12] Notwithstanding defendant's protestations to the contrary, the notice was sufficient to fulfill the statutory requirements as we have interpreted them. (See *People* v. *Miranda, supra,* 44 Cal.3d at p. 97; *People* v. *Howard* (1988) 44 Cal.3d 375, 419-425 [243 Cal.Rptr. 842, 749 P.2d 279].)

## C. *Separate Jury.*

■ Defendant contends that he should have had a separate jury to consider his penalty alone. He relies on the previously discussed asserted prejudice from the statutory requirement that he share peremptory challenges with codefendant Fields. We have already decided that the trial court did not abuse its discretion in denying the motion to sever trials. Once the joint trial was underway, the statutory preference for a single jury came into play. (See *People* v. *Gates* (1987) 43 Cal.3d at 1168, 1199 [240 Cal.Rptr. 666, 743 P.2d 301].) Defendant did not specifically move for a separate jury, instead raising the issue by motion for mistrial. In any event, defendant's motion did not establish good cause for a new jury. (*Ibid.*)

## D. *Effect of Guilt Phase Errors.*

Defendant urges that any errors found harmless at the guilt phase be reweighed at the penalty phase. Since we have rejected virtually all of defendant's claims of guilt phase error, no more need be said.

## E. *Prosecutorial Misconduct.*

■ Defendant contends the prosecutor committed misconduct by inviting the jury to consider the time and expense of retrying the case in the following statement: "There are two things I want to mention before I get into the facts here. I'm going to do that briefly. I don't expect arguments will be anywhere nearly as long in this phase of the case. [¶] The two things are first of all that you have been here, as you know, a great deal of time. And I know that. That's serious in a case where you have been here as long as you have. There are undoubtedly going to be differences of opinions among you in terms of things that have perhaps nothing to do with this case

---

[12]The notice question was raised again at the motion for new trial. In denying the motion, the court stated: "Formal notice had not been given but all of the circumstances that were to be used were made known to the defendant by the People. And I think in substantially—and in writing, written documents were given to the defendant in support of those circumstances long before the motion was made by the defendant to have a formal notice. When that motion was made I required the People to give you formal notice which was given to you the day that the jury trial actually started. And it was my opinion—I still have that feeling—that no prejudice resulted to the defendant from the circumstances of this case as far as notice is concerned."

at all, things to do with issues such as the death penalty, such as life in prison without the possibility of parole, but just personal things who's smoking, who isn't, all of those things. [¶] At the outset I'd like to say that 1 ask that you keep in mind the importance of this decision to my clients, the People out there in the community. And, of course, the importance in this case to the clients of the defense attorneys because those things, of course, really have nothing to do with this case at all. I only mention it again because you have been together so long. If you have been together three days, I certainly wouldn't even say that. But I don't think—if this jury for instance could not reach a decision as to one or both of the defendants here, *and we had to try it again and go step by step, day by day through this case all over all over again because of something*—" (Italics added.)

Defense counsel objected, stating: "There's no showing that this case would have to be tried again. It is not proper argument, calls for speculation." At a sidebar conference the court overruled the objection, finding nothing improper in the argument. The prosecutor then resumed, stating: "What I believe I was saying was that I hope that you'll be able to put aside any personal things in terms of things that have nothing to do with this case and be able, if it's possible, to reach a verdict. The Judge will instruct that it takes a unanimous verdict in this case to reach the decision as to either or both of the defendants or either of the two penalties involved."

In context, it is clear that the prosecutor was urging the jurors to do their best to reach a verdict.

Defendant further asserts that the impact of counsel's argument is demonstrated by the fact that on the first day of deliberations the jury sent the following query: "If the jury cannot come to a unanimous agreement on one of the defendants, what happens to the defendant after this time? Does he get sentenced by the Court or is there a complete retrial for the conviction and penalty?" After discussion with counsel, the court responded: "If there is further trial, it would be on the penalty phase only."

Even if a causal connection could be shown between the prosecutor's argument and the jury's query, there is nothing wrong with the answer given by the court. (See *People* v. *Hamilton* (1988) 46 Cal.3d 123, 153-156 [249 Cal.Rptr. 320, 756 P.2d 1348].)

Defendant cites four other instances of alleged misconduct. ■ The first was the prosecutor's question to Bessy Henderson regarding whether she had ever seen defendant with a bigger gun than the one he pulled on her. The point is waived since defense counsel raised no objection, and any

conceivable prejudice could have been cured by an admonition. (*People* v. *Green, supra,* 27 Cal.3d at p. 27.)

■ The second instance was a question by defense counsel to Officer Siegel which elicited testimony that he had arrested and released defendant the day before the armed robbery of the officers. Although the prosecutor asked that the officer be allowed to finish his answer, the questioning was done by defense counsel. That is not prosecutorial misconduct.

■ The third instance was the prosecutor's eliciting testimony from Officer Siegel that it was a crime in Missouri in 1969 to carry a concealed weapon. Although defense counsel objected on the ground that there was no showing the young men had no licenses, he now asserts the testimony was inadmissible because it proved a crime of which no notice was given. That may be true, but it is inconceivable that defendant could have been prejudiced in light of the proper admission of the testimony to show defendant's participation in armed robbery—a crime for which notice was given.

■ The fourth instance of asserted misconduct was the prosecutor's objections to defense counsel's argument: "Mr. Gardner [the prosecutor] stands before you and says well this was a terrible thing. He mentions the word execution. Let me point out to you that any of these particular type of factors is the—or are the burdens of the prosecution. They must prove these factors in aggravation beyond reasonable doubt. Now, Mr. Gardner had the opportunity of bringing in a pathologist, a coroner's examiner or somebody, and asked them to describe the trajectories. Was the man standing when he was hit based upon the trajectory? Was the man laying [*sic*] down when he was hit? Depending on the trajectory, but Mr. Gardner asked you to use speculation and conjecture." The prosecutor objected, stating: "Counsel stipulated the coroner out of this case. I was not able to bring him in." After the prosecutor again objected about the stipulation, the court instructed the jury that the "stipulation is a fact like any other fact proved in this case and follow your recollection as to what was stipulated to you." We do not agree with defendant's assertion that the prosecutor's objections implied that the coroner would have testified the murder was an execution-style killing. No impropriety appears in the objections.

## F. *Instruction on Admissions.*

■ Defendant contends the court prejudicially erred in failing to instruct sua sponte that admissions by a defendant are to be viewed with caution. The admissions to which he refers are: (1) telling Bessy Henderson being lied to made him want to hurt somebody; (2) telling the Missouri prison guard, "Don't fuck with me"; (3) the statement someone in the

group made to the two Missouri police officers, "Go for your gun and you're dead."

The statements in question were not admissions as that term is defined in CALJIC Nos. 2.70 and 2.71, the instructions defendant claims should have been given. Those instructions state that an admission is a statement by a defendant, which does not acknowledge his guilt by itself but which tends to prove guilt when considered with the rest of the evidence. None of these statements played a part in establishing defendant's guilt of the crimes in question—(1) brandishing a firearm; (2) manslaughter; (3) robbery. Thus the court had no sua sponte duty to instruct on viewing a defendant's admissions with caution. Moreover, any error in failing to so instruct would have been harmless in any event.

G. *Sentencing Discretion.*

The jury was instructed in the language of former CALJIC No. 8.84.2 as follows: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death." Defendant contends the jury was thereby misled as to its role in determining the appropriateness of the death penalty in this case.

In *People* v. *Brown* (1985) 40 Cal.3d 512, 538-545 [220 Cal.Rptr. 637, 709 P.2d 440] (revd. on other grounds *California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]), we upheld the 1978 death penalty statute against a challenge that it withdrew constitutionally compelled sentencing discretion from the jury. We observed that "the word 'weighing' is a metaphor for a process which by nature is incapable of precise description. The word connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary 'scale,' or the arbitrary assignment of 'weights' to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider . . . . By directing that the jury 'shall' impose the death penalty if it finds that aggravating factors 'outweigh' mitigating, the statute should not be understood to require any juror to vote for the death penalty unless, upon completion of the 'weighing' process, he decides that death is the appropriate penalty under all the circumstances." (*Id.* at p. 541.) We acknowledged, however, that the words "shall impose a sentence of death" left room for confusion and stated that each case must be considered on its own merits to determine whether the jury "may have been misled to defendant's prejudice about the scope of its sentencing discretion under the 1978 law." (*Id.* at p. 544, fn. 17.)

In the present case, the court gave some supplemental instructions that helped clarify the jury's role. It instructed the jury: "Although you were instructed during the guilt phase of this trial that you must set aside any sympathy or pity for a defendant in determining his guilt or innocence, this rule does not apply to the penalty phase. You may consider sympathy or pity for a defendant, if you feel it appropriate to do so, in determining whether to impose death penalty or life in prison without possibility of parole." After giving CALJIC No. 8.84.2, the court instructed: "The word 'outweigh' does not mean that you shall simply count the factors on each side and arrive at a decision based on numerical sums. Rather it is your duty to evaluate the significance, if any, of each factor and ascribe to it the weight to which you believe it is entitled. [¶] For example, a single mitigated [*sic*] factor may outweigh several aggravating factors. I have previously read to you the list of aggravating circumstances which the law permits you to consider, if you find that any of them is established by the evidence. These are the only aggravating circumstances that you may consider. [¶] The mitigating circumstances which you have read for your consideration are given to you merely as examples of factors that you may take into account as reasons for deciding not to impose a death sentence upon a defendant. [¶] You should pay careful attention to each of these factors. Any one of them may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this case. But you should not limit your consideration of mitigating circumstances to these specific factors. [¶] You may also consider any other circumstances relating to the case or to a defendant as reasons for not imposing a death sentence. The fact that you found a defendant guilty beyond a reasonable doubt of the crime of murder in the first degree is not, itself, an aggravating circumstance."[13]

The court's additional instructions insured that the jury was properly informed of its sentencing discretion and responsibility. Contrary to defendant's assertion, the prosecutor did not divert the jury from this proper understanding. He exhorted the jurors to base their verdict on the facts and the law, stating: "Now I remind you that all juries and this particular jury, of course, the same way, the jury's sworn to find a verdict based upon the facts and based upon the law, things set—the fact, obviously set over a year ago, some of them, some of them longer, and the law is set by either legislators or by a vote of the public. They aren't personal matters as to the

---

[13] Defendant contends the trial court should have instructed sua sponte as to the definition of "life without possibility of parole" and as to the jury's obligation to assume there would never be parole, particularly where voir dire revealed this to be a significant concern of at least one trial juror. We held in *People* v. *Thompson* (1988) 45 Cal.3d 86, 129-131 [246 Cal.Rptr. 245, 753 P.2d 37], that the court did not err in refusing to give a similar instruction that the defendant had requested. A fortiori it is not error to fail to instruct sua sponte.

jurors." The prosecutor argued that the aggravating circumstances presented as to defendant should be given heavy weight vis-à-vis the mitigating circumstances. The prosecutor reminded the jury that its weighing job involved determining the importance to be given the various mitigating and aggravating circumstances found.

Defendant contends the prosecutor was urging the jury to hide behind the law and to minimize its sense of responsibility in the following: "As far as your being comfortable, I think that the only way to be—I hate that word. The only way to feel right about this case, let me use that. The only way you can feel right about this case is not to take the law into your own hands. And the only way not to take the law into you own hands is to follow the law and follow the facts and reach an appropriate verdict because that's what you're sworn to do. If you follow the facts and you follow the law to a fair, reasonable, just verdict, then I don't see how anyone, including yourselves, because that's the most important, could be unhappy with what you've done. However, if you take upon yourself the responsibility of doing other than what the law says, other than what the facts and the evidence are, then you have to have done something personally then maybe you are responsible for consequences because you've actually done something that's outside the law. If you follow the law I think that would be the best way to feel right, that you did the right thing in this case . . . ."

The above statement was made in response to Fields's counsel's closing remarks: "I think what you have to do in a case like this basically is to know in your own hearts that 10 years from now, 15—20 years from now you're going to have to be comfortable with your decision and that you know that you did the right thing so that when you wake up in the middle of the night you're comfortable with it and you know that you've met your social responsibilities." The prosecutor acknowledged that he did not think anyone could be totally comfortable with a death sentence, but that he thought it was clearly the appropriate sentence for defendant: "If you want comfort this just isn't the right case." He then proceeded with the above-quoted statement.

In context, we do not believe that the prosecutor's statement constituted error under *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633], which held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere. . . ." (*Id.* at pp. 328-329 [86 L.Ed.2d at p. 239].) In *Caldwell* the prosecutor sought to minimize the jury's sense of the importance of its role by telling the jury that its determination of

whether death was the "appropriate" penalty would be reviewed for correctness by the state supreme court.

Here, as contrasted with *Caldwell,* the prosecutor emphasized to the jury that its task was to determine what the appropriate penalty was for this defendant and that in making such a decision it would be difficult for a juror to be comfortable with such an awesome task. The argument is not at all the same as that in *People* v. *Milner* (1988) 45 Cal.3d 227 [246 Cal.Rptr. 713, 753 P.2d 669], where we found *Caldwell* error. (See also *People* v. *Hendricks* (1988) 44 Cal.3d 635, 655 [244 Cal.Rptr. 181, 749 P.2d 836].)

### H. *CALJIC No. 8.84.1.*

Defendant identifies a number of asserted shortcomings of the text of CALJIC No. 8.84.1 which was read to the jury:

#### 1. *Deletion of Inapplicable Mitigating Factors.*

██ The trial court has no duty to delete irrelevant mitigating factors. (*People* v. *Miranda, supra,* 44 Cal.3d at pp. 104-105.)

Defendant contends that the failure to delete inapplicable mitigating circumstances allowed the prosecutor to commit *Davenport* error. (*People* v. *Davenport* (1985) 41 Cal.3d 247 [221 Cal.Rptr. 794, 710 P.2d 861].) The prosecutor twice made fleeting reference to an absent factor being an aggravating factor, but he went on to argue the irrelevance of the inapplicable mitigating factors. To the extent that *Davenport* error was committed, defendant waived the point by failing to object since an admonition would have cured any possible prejudice. (See *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 788, 790 [230 Cal.Rptr. 667, 726 P.2d 113].) Moreover, any such error was clearly harmless in any event. (See *People* v. *Brown* (1988) 46 Cal.3d 432, 456 [250 Cal.Rptr. 604, 758 P.2d 1135].)

#### 2. *Modification of Section 190.3, Factor (f).*

██ Defendant contends the trial court sua sponte should have modified CALJIC No. 8.84.1 factor (f) ("Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct") so that a finding of a reasonable belief in extenuation for the shooting could be deemed a factor in mitigation in light of evidence presented by Gary Ingalls that Dukar attempted to pull his own gun at the time he was shot. We disagree. The instruction as given left room for defendant's argument, and such argument also would have fit perfectly under factor (k) of section 190.3 in CALJIC

No. 8.84.1 ("Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime"). (See *People* v. *Ghent, supra,* 43 Cal.3d at p. 776.)

### 3. *Dual Use of Underlying Crimes.*

 We agree with defendant that factors (b) and (c) of section 190.3 should be construed to apply only to criminal activity other than the crimes for which the defendant was convicted in the present proceeding. We so held in *People* v. *Miranda, supra,* 44 Cal.3d at pages 105-106. Although we suggested clarifying CALJIC No. 8.84.1 in the future, we did not hold that instruction in the statutory language itself constitutes error. (*Id.* at p. 106, fn. 28.) The record here discloses no jury confusion on this point, and the jury was expressly told not to count, but instead to weigh the countervailing factors.

### 4. *Overlap of Section 190.3, Factors (b) and (c).*

 Defendant contends the court should have modified CALJIC No. 8.84.1 to make it clear that factor (c) of section 190.3 ("the presence or absence of any prior felony conviction") applied only to felonies other than those covered under factor (b) of section 190.3 ("the presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence"). We disagree. We held in *People* v. *Melton* (1988) 44 Cal.3d 713, 764-765 [244 Cal.Rptr. 867, 750 P.2d 741], that an offense which qualifies under both factors (b) and (c) may properly be considered under both.

### 5. *Section 190.3, Factor (k).*

The instruction on factor (k) did not specifically include the addition to CALJIC No. 8.84.1 made after our suggestion in *People* v. *Easley, supra,* 34 Cal.3d 858, 878, footnote 10, directing the jury to consider "any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death,'" but in general its thrust complied with our suggestion. The jury was instructed that it was permissible to consider sympathy or pity for the defendant in determining penalty. It was also instructed that it could "consider any other circumstances relating to the case or to a defendant as reasons for not imposing a death sentence." Here the court's instruction was broader than our *Easley* suggestion and was sufficient to convey to the jury the message contained in the post-*Easley* version of the instruction. (See *People* v. *Howard, supra,* 44 Cal.3d at pp. 433-434.)

### 6. *Refusal to Instruct on Leniency to Hodges as Mitigating Factor.*

■ The court did not err in refusing to instruct that the leniency granted to Hodges could be considered as a factor in mitigation. In *People* v. *Belmontes* (1988) 45 Cal.3d 744, 811-813 [248 Cal.Rptr. 126, 755 P.2d 310], we held that the court did not err in refusing to admit at the penalty phase evidence of the codefendants' negotiated plea dispositions as mitigating evidence. The reasoning there applies equally here. The focus in a penalty phase trial of a capital case is on the character and record of the individual offender. The individually negotiated disposition of an accomplice is not constitutionally relevant to defendant's penalty determination.

### I. *Constitutionality of Section 190.3, Factor (b).*

■ Defendant contends that section 190.3, factor (b) is unconstitutionally vague. We have upheld the constitutionality of section 190.3, factor (b) in *People* v. *Balderas, supra,* 41 Cal.3d at pages 201, 204-205 and *People* v. *Miranda, supra,* 44 Cal.3d at page 97.

### J. *Circumstances of the Crime.*

■ Defendant contends that permitting the jury to aggravate simply on the basis of the circumstances of the crime (§ 190.3, factor (a)) permits unconstitutionally broad and unfettered discretion and allows imposition of the death sentence on the basis of factors common to virtually all felony murders. We have rejected these contentions in *People* v. *Gates, supra,* 43 Cal.3d at pages 1188-1189, 1208. (See also *Lowenfield* v. *Phelps* (1988) 484 U.S. 231 [98 L.Ed.2d 568, 108 S.Ct. 546].)

### K. *Burden of Proof.*

■ Defendant contends the jury should have been instructed that the prosecutor had a burden of proof beyond a reasonable doubt that aggravating circumstances outweigh mitigating circumstances and a separate and distinct burden of persuasion beyond a reasonable doubt that death was the appropriate remedy. This contention has been rejected in many cases. (See e.g., *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779; *People* v. *Gates, supra,* 43 Cal.3d at p. 1201.)

### L. *Other Violent Criminal Activity.*

■ Defendant contends no testimonial evidence as to the facts underlying the criminal activity involving force or violence should be admitted at

the penalty phase except for documentary evidence of the fact of prior convictions. We have held to the contrary. (See *People* v. *Gates, supra,* 43 Cal.3d at p. 1203.) ■ Defendant further contends that the jury should have been told not to consider "other crimes" evidence against defendant unless there was *unanimous agreement* beyond a reasonable doubt of his guilt of those offenses. We rejected such a claim in *People* v. *Ghent, supra,* 43 Cal.3d at pages 773-774, finding the *Robertson* (*People* v. *Robertson* (1982) 33 Cal.3d 21 [188 Cal.Rptr. 77, 655 P.2d 279]) instruction sufficient. ■ We have also previously rejected defendant's claim that the court should have instructed sua sponte on the elements of the "other crimes." (See e.g., *People* v. *Ghent, supra,* 43 Cal.3d at p. 773; *People* v. *Gates, supra,* 43 Cal.3d at p. 1202, fn. 12.) The same reasoning applies to instructions on aiding and abetting and circumstantial evidence.

■ Although we have rejected claims that the penalty jury should be required to make written findings as to other crimes (*People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779; *People* v. *Gates, supra,* 43 Cal.3d at p. 1203), defendant nevertheless argues that the court should have at least listed the other crimes the jury was being asked to consider. He relies on *People* v. *Phillips* (1985) 41 Cal.3d 29, 72, footnote 25 [222 Cal.Rptr. 127, 711 P.2d 423], where we said: "Once the trial court has determined what evidence is properly admissible as other criminal activity [citation], 'the prosecution should request an instruction enumerating the particular other crimes which the jury may consider as aggravating circumstances in determining penalty. . . . [T]he jury should be instructed not to consider any additional other crimes in fixing the penalty.' (*People* v. *Robertson, supra,* 33 Cal.3d at p. 55 fn. 19.)" The trial here preceded our decisions in *Phillips* and *Robertson*. We do not believe that the absence of such instruction could have affected the verdict.

■ Defendant finally asserts that evidence of the St. Louis robbery incident should not have included reference to any offense other than the robbery—that evidence of the assaults and other matters should have been precluded as barred by the statute of limitations. The argument is specious. The statute allows admission of evidence of other criminal activity involving violence.

M. *Proof Beyond a Reasonable Doubt as to Each Aggravating Factor and Written Findings.*

■ We have already held that there is no constitutional requirement that a penalty jury be required to find that each aggravating factor has been proven beyond a reasonable doubt or that the jury make written findings as to the existence of aggravating circumstances and the conclusion that the

aggravating factors outweigh the mitigating. (*People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779.)

N. *Ineffectiveness of Counsel.*

 Defendant contends he was deprived of his constitutional right to the effective assistance of counsel. To establish entitlement to relief for ineffective assistance of counsel the burden is on the defendant to show (1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings. (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]; *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]; see also *Strickland* v. *Washington* (1984) 466 U.S. 668, 687-696 [80 L.Ed.2d 674, 693-699, 104 S.Ct. 2052].) When a defendant makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation. If the record sheds no light on why counsel acted or failed to act in the manner challenged, unless counsel was asked for an explanation and failed to provide one or unless there could be no satisfactory explanation, the case is to be affirmed on appeal. (*People* v. *Pope, supra,* 23 Cal.3d at pp. 425-426.) In such cases, the claim is more appropriately made in a petition for habeas corpus. (*Ibid.*)

 In the present case, defendant recasts as ineffectiveness-of-counsel claims a number of previously discussed contentions where counsel failed to object below. None of these matters, however, was so significant that counsel's failure to object could be termed inexplicable or that it was reasonably probable that a determination more favorable to defendant would have resulted had counsel objected.

 Defendant also charges his trial counsel with ineffectiveness in deciding to call Barcialee Barbarick as a witness. He faults counsel additionally for announcing to the jury his intention to call Barbarick before he had ever talked with him and for then spending only 10 minutes talking with Barbarick before putting him on the stand. Defendant fails to note, however, that the record shows his investigator had gone to Missouri and had talked with Barbarick. Although Barbarick testified he talked with defense counsel for only 10 minutes, that does not in itself establish ineffectiveness. As to the decision to call Barbarick, the record sheds no light on counsel's reasons for doing so. Since there may have been valid tactical reasons for calling Barbarick, the ineffectiveness claim fails on appeal. (See *People* v. *Pope, supra,* 23 Cal.3d at p. 425.) Counsel could reasonably have felt it wiser to present the facts underlying defendant's

manslaughter conviction than to leave the jury aware of only the bare fact of a manslaughter conviction. Moreover, Barbarick's testimony, if believed, exonerated defendant from responsibility for the death. We cannot call the decision to have Barbarick testify unreasonable.

### O. *Modification Motion.*

 Defendant contends the court's ruling on the automatic modification-of-verdict motion was inadequate under *People* v. *Rodriguez, supra,* 42 Cal.3d at pages 792-794. As we noted in *Rodriguez,* section 190.4, subdivision (e) requires the trial judge to make an independent determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and the applicable law. (*Id.* at p. 792.) The judge must "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances . . . and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings." (§ 190.4, subd. (e).)

The motion for modification of verdict was heard at the same time as a motion for new trial. Before proceeding with the motion for new trial the court stated: "The law provides that the Court should automatically review the case as for the appropriateness of the verdicts and to ascertain whether the verdicts are supported by the evidence and the law." The court then heard argument on the motion for new trial. In denying a new trial, the court referred to a number of evidentiary and legal points.

The court then returned to the motion for modification, stating: "I have reviewed all of the instructions that were given to the jury and the notes I had taken of all the testimony of all the witnesses as I think I'm required to do, review the entire record. The Court's duty to review the record in this situation is automatic. And I feel that the evidence both as to the guilt of the Defendant Johnson as to all three counts of the complaint and as to the truth of the special circumstances was overwhelming and the jury verdict as to guilt was amply supported by the evidence and as to the penalty that the jury found that all parties were given a fair and equal opportunity to present their case to the jury. And I feel the jury was properly and fully instructed on the law, and, therefore, it does not appear to the Court that there is any basis for disturbing the verdicts even with reference to the finding of guilty, the finding of truth of the special circumstances or the finding as to the penalty."

We conclude that the court's statements were sufficient to show compliance with section 190.4, subdivision (e). The court reviewed all of the

evidence and made a finding that there was no "basis for disturbing the verdicts." This indicates that the court understood its duty to determine whether the findings and verdicts are contrary to the law or evidence presented. The court's statement at the time of sentencing confirms such: "The record will reflect . . . that the court has automatically as required by law reviewed the entire record to determine whether the verdict is supported by the evidence and is in accordance with the law. And the court concludes that it is." Although the statement of reasons is not as detailed as we might like, it is sufficient. (See *People* v. *Ruiz* (1988) 44 Cal.3d 589, 625 [244 Cal.Rptr. 200, 749 P.2d 854].) It is clear that the court had in mind its obligation to independently review the evidence and did give some reasons to support its ruling. The ruling on this automatic motion was made in conjunction with a noticed motion for new trial under section 1181, thus making the scope of the combined motions broader, in fact, than a section 190.4, subdivision (e) motion alone. The present case is unlike *People* v. *Rodriquez, supra,* 42 Cal.3d at pages 792-795, where the court, in addition to failing to state any reasons, failed to undertake any independent review of the evidence. The reasons given here are also more substantial than those found wanting in *People* v. *Heishman* (1988) 45 Cal.3d 147, 199-200 [246 Cal.Rptr. 673, 753 P.2d 629]. Moreover, it is not reasonably possible that a remand for more detailed reasons would result in any change in the court's ruling.

## P. *Disproportionality of Sentence.*

█ Defendant contends he should be given proportionality review on both an intracase and intercase basis. We have held in numerous cases that intercase proportionality review is not required. (See e.g., *People* v. *Allen, supra,* 42 Cal.3d at pp. 1285-1286; *People* v. *Howard, supra,* 44 Cal.3d at pp. 444-445.) █ As to intracase review, defendant relies on *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697] in arguing that the death penalty is disproportionate in light of sentences given Hodges and Fields.

Defendant's reliance on *Dillon* is misplaced. The facts of this case bear no similarity to the circumstances in *Dillon,* where an immature 17-year-old defendant, who shot and killed his victim out of fear and panic, was sentenced to life in prison despite the view of judge and jury that the sentence was excessive in relation to his true culpability. (34 Cal.3d at p. 487.) Nothing in the record here indicates it is disproportionate that defendant, the actual killer, was sentenced to death while his codefendant aider and abettor received a lesser sentence. Defendant's situation is not comparable to that of Hodges, an aider and abettor who received a negotiated disposition in return for an agreement to testify.

## VI. Conclusion

The judgment is affirmed in its entirety.

Lucas, C. J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**MOSK, J.**—I dissent. The majority err in holding that defendant was not denied his state constitutional right to trial by a jury drawn from a representative cross-section of the community. (Cal. Const., art. I, § 16; *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (hereafter *Wheeler*).)

The majority also err in holding that defendant was not denied his federal constitutional right to equal protection of the laws. (U.S. Const., 14th Amend.; *Batson* v. *Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (hereafter *Batson*).) *Batson* applies to all cases pending on direct appeal when it was decided. (*Griffith* v. *Kentucky* (1987) 479 U.S. 314 [93 L.Ed.2d 649, 107 S.Ct. 708].) This is such a case.

The majority pay lip service to the *Batson* rule, but in fact violate both its letter and its spirit. On this issue, however, the federal courts—not the majority—have the last word. I therefore recommend that defendant seek federal review of the majority's erroneous holding that he was not denied his *Batson* rights when the prosecutor deliberately struck all the Blacks, all the Asians, and all the Jews from the jury that condemned him to death.[1] I would hope that federal courts will be sensitive to the racial overtones of this result.

I

*Wheeler* and *Batson* established a number of now-familiar principles that govern this case. First, *Wheeler* held that neither party to a criminal trial may use peremptory challenges to exclude from the jury, solely on the ground of a presumed "group bias," all or most members of a cognizable group distinguished on racial, religious, ethnic or similar grounds. (22 Cal.3d at pp. 276-277.) Somewhat more narrowly, *Batson* held that the prosecutor in such a trial may not use peremptory challenges to exclude from the jury members of the defendant's race, solely on account of their race. (476 U.S. at pp. 96-99 [90 L.Ed.2d at pp. 87-90].)

---

[1] While *Batson* involved Blacks, there is no reason to believe the Supreme Court is any less concerned about discrimination against other ethnic minorities. (See, e.g., *Shaare Tefila Congregation* v. *Cobb* (1987) 481 U.S. 615 [95 L.Ed.2d 594, 107 S.Ct. 2019] [held, Jews are a cognizable group for purposes of federal civil rights statute (42 U.S.C. § 1982)].)

Second, both courts prescribed a procedure for implementing the rights thus declared. *Wheeler* provided that if a party believes his opponent is using peremptory challenges to exclude prospective jurors on the ground of group bias, he must make a record of the circumstances, raise a timely objection, show that the excluded jurors are members of a cognizable group, and present a prima facie case that such jurors are being challenged on the ground of group bias. If the court finds that a prima facie case has been made, the burden shifts to the other party to show if he can that he exercised such peremptory challenges on grounds of "specific bias," i.e., on grounds reasonably relevant to the particular case on trial or its parties or witnesses. If the court finds that the burden of justification is not sustained, it must dismiss the jurors selected and quash the venire. (22 Cal.3d at pp. 280-282.)

*Batson* similarly provided that if a defendant believes the prosecutor is using peremptory challenges in a purposefully discriminatory manner, he must show that he is a member of a cognizable racial group, that the prosecutor has peremptorily struck members of that race from the venire, and that these facts and any other relevant circumstances raise an inference that the prosecutor is using his peremptory challenges to exclude prospective jurors on the account of race. (476 U.S. at p. 96 [90 L.Ed.2d at pp. 87-88].) If the trial court finds that the defendant has made a prima facie case of discrimination, the burden shifts to the prosecutor to give if he can a "neutral explanation" for the challenges that is "related to the particular case to be tried." (*Id.* at p. 98 [90 L.Ed.2d at p. 88].) If the court finds that the prosecutor has not sustained his burden, it may either disallow the discriminatory challenges or quash the venire. (*Id.* at p. 100, fn. 24 [90 L.Ed.2d at p. 90].)

Third, both this court and the United States Supreme Court have made it clear that peremptory challenges which operate to exclude cognizable groups from the jury cannot be justified by superficial, sham, or illegitimate reasons; accordingly, each court has directed trial judges to carefully evaluate both the bona fides and the sufficiency of any explanations offered to justify otherwise discriminatory challenges. Thus in a decision authored by Chief Justice Lucas reversing a judgment of death on *Wheeler* grounds, we recently reiterated that "Once a prima facie case has been shown, and an explanation tendered, the trial court must make a 'sincere and reasoned attempt to evaluate the . . . explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the [counsel asserting the peremptory challenges] has examined members of the venire and has exercised challenges for cause or peremptorily, for "we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses

belatedly contrived to avoid admitting acts of group discrimination." ' [Citations.]" (*People* v. *Snow* (1987) 44 Cal.3d 216, 222 [242 Cal.Rptr. 477, 746 P.2d 452].)

Similarly *Batson* declared that the prosecutor may not rebut the defendant's prima facie case of racial discrimination merely by affirming his good faith or by denying that he had a discriminatory motive. (476 U.S. at p. 98 [90 L.Ed.2d at pp. 88-89].) Rather, the prosecutor must give "a 'clear and reasonably specific' explanation" of his reasons for exercising the peremptory challenges in question. (*Id.* at fn. 20.) The high court further declared that the prosecutor's reasons for exercising peremptory challenges must be " 'legitimate reasons' " (*ibid.* [90 L.Ed.2d at p. 89]), and reiterated that it expected prosecutors to fulfill their duty to use such challenges "only for legitimate purposes" (*id.* at p. 99, fn. 22 [90 L.Ed.2d at p. 89]).

## II

The record establishes that defendant is Black, codefendant Thomas Fields is Black, the victim was White, and defendant's trial counsel is Jewish. In the course of the voir dire three Black prospective jurors were called to the jury box; all three were examined and passed for cause by all counsel; and the prosecutor then struck all three Blacks from the jury by peremptory challenge. There were also four Jewish prospective jurors; all four were examined and passed for cause; and the prosecutor struck all four from the jury by peremptory challenge. Finally, there were two Asian prospective jurors; both were examined and passed for cause; and the prosecutor struck both from the jury by peremptory challenge. The jury that was ultimately selected was all White, and included no Blacks, no Jews, and no Asians.

Before the jury was sworn both defendants objected to the exclusion of the nine minority jurors by a timely *Wheeler* motion. Counsel for defendant stated, "We do not have anyone from the Jewish community, we have no one from the Oriental community and we have no one from the Black community. If this area is composed of basically Caucasian, Blacks and Orientals,[2] two of those racial groups [have] been excluded. If this community is composed of people of the Christian faith, the Jewish faith, and possibly Buddhist, we have nobody from those [latter] two religious groups. Therefore, under these circumstances, we feel that the burden now shifts to the People to justify the exclusion of three definitely recognizable groups in the community and eliminating them from the panel, thereby depriving the

---

[2] The case was tried in Santa Clara Superior Court, sitting in the City of San Jose.

defendants of the opportunity of a jury composed of a representative cross-section of the community."

After some discussion of the proper scope of the motion, the court turned to the prosecutor and said, "Do you wish to respond?" Although the court thus failed to find expressly that defendant had made a prima facie case of discrimination against the minority jurors on the ground of group bias, we may "fairly deem that the inquiry implied such a finding, and shifted the burden of justification to the prosecutor. Indeed, after *Wheeler* it is disingenuous to treat such inquiries as anything else." (*People* v. *Turner* (1986) 42 Cal.3d 711, 719 [230 Cal.Rptr. 656, 726 P.2d 102].)[3] The majority agree the trial court found that defendant made the necessary prima facie case. (*Ante,* p. 1217.)

## A. *The Jewish Prospective Jurors*

The prosecutor undertook to justify each of the peremptory challenges in question. He began, however, by denying that Jews are a cognizable group. In this he was wrong. As defense counsel correctly asserted, Jews are a cognizable group for *Wheeler* purposes whether viewed from a religious, ethnic, or cultural perspective, or a combination of these. The long history of anti-semitism teaches this lesson all too clearly.

In any event, the prosecutor proceeded to offer explanations for his peremptory challenges of all the Jews on the panel. First he declared that "I have friends who are Jewish and have them to my home and I am entertained at their homes," and "some of the more diligent prosecutors in our office" are Jews. This ritual recitation of the hoary excuse, "some of my best friends are Jewish," is obviously insufficient as a matter of law. As the United States Supreme Court explained in *Batson,* the prosecutor does not rebut a prima facie case of group discrimination merely by affirming his good faith or denying that he personally intended to discriminate. (476 U.S. at p. 98 [90 L.Ed.2d at p. 88].) Defense counsel was therefore correct when he objected that "the record should not be filled with off-hand social pronouncements by the prosecutor."

The prosecutor then offered a number of reasons for each of his peremptory challenges of the four Jewish prospective jurors. They fall generally into two categories: "objective" reasons based on matters of record, i.e., on answers given by the prospective jurors to questions asked of them on voir dire; and "subjective" reasons based on matters outside the record, i.e., on

---

[3] In our *Turner* opinion we went on to advise trial courts that such findings should be express rather than implied. (42 Cal.3d at p. 719, fn. 3; see also *id.* at p. 729 (conc. opn. of Panelli, J.).) This case was tried before *Turner.*

the prosecutor's perception or opinion of the demeanor, personality, or appearance of the prospective jurors. For our purposes these are sharply different categories: both the trial court and a reviewing court can test the prosecutor's objective reasons against the record; but his subjective reasons are largely unverifiable by the trial court, and are wholly beyond appellate review. Accordingly, in the analysis that follows I shall assess the prosecutor's objective reasons in light of the record, but shall simply note his subjective reasons for later discussion. (Part IV, *post.*)

The first Jewish prospective juror discussed by the prosecutor was Joanne Smalley. The prosecutor began by representing to the court that "at the time I excused her I didn't know that she was Jewish." The record casts serious doubt on this assertion: during her voir dire examination Mrs. Smalley expressly confirmed that as she had stated in her juror questionnaire, she is a member of the "Temple Beth Shalom Sisterhood," and said she attends temple services frequently. The prosecutor, of course, had a copy of her questionnaire and was present when Mrs. Smalley acknowledged these facts in open court.

The prosecutor's sole objective reason for excluding Mrs. Smalley was that she allegedly said "she was opposed to the death penalty or leaned that way," and "She didn't know if she'd follow the law and the evidence or not if she found [the death penalty] to be appropriate . . . ."[4] The record shows the prosecutor's assertion to be part exaggeration, part misstatement. Mrs. Smalley squarely told the prosecutor on voir dire that "I'm not definitely for or definitely against the death penalty." When asked to characterize her view she replied that although she had never previously had to make a decision on the question, she would probably "lean towards not being for" the death penalty. But she repeatedly explained that she would nevertheless follow the law and the evidence on the question. Thus the court asked her, "If you felt after hearing all the evidence in this case and the instructions on the law that the death penalty was an appropriate penalty as to one or both defendants, would you have any reluctance voting in favor of it?" She replied, "I don't believe so." The prosecutor thereafter asked her, "Can you picture yourself voting for [the death penalty] if that would be the appropriate penalty for one or both of these defendants?" She flatly answered, "Yes."

By contrast, the prosecutor did accept similar assurances from other jurors who had scruples about imposing the death penalty but said they

---

[4] The prosecutor also said the exact opposite, to wit, "She did say . . . that if the death penalty was appropriate, she didn't believe that she'd be *unable* to vote for it" (italics added). For purposes of this discussion we may assume that in so saying either he misspoke or his words were incorrectly reported.

could do so in an appropriate case. Thus Juror Luis Reguero[5] admitted, "I would be reluctant" to vote for death, but said he could so vote even though "I may not like the decision." Alternate Juror Rose Tucker conceded, "I am definitely more weighted towards the life imprisonment," and explained that "I most likely tend toward life imprisonment just because I think life is important"; but she too said that she could nevertheless vote for death in an appropriate case. Neither was challenged by the prosecutor.

The rest of the voir dire examination of Mrs. Smalley was unremarkable and showed her to be a fully qualified juror with no perceivable bias about the case. She was a licensed real estate agent and her husband was a high school teacher. Indeed, other information elicited from her during voir dire was of the type that is ordinarily thought to be favorable to the prosecution. Thus Mrs. Smalley disclosed that a local police officer was a "close friend" of hers whom she had known for 12 or 13 years and whom she often saw socially; she also had a cousin who was a deputy sheriff.

The prosecutor's remaining reasons for excluding Mrs. Smalley were wholly subjective. He claimed she was "a very nervous person," that "she gave the defendants a very noticeable smile" when she was introduced to them and to counsel, and that "she looked to me to be a very sympathetic person, and one that would make a poor juror." The prosecutor did not explain any of these remarks, and none, of course, is verifiable on the record.

The second Jewish prospective juror discussed by the prosecutor was Charles Kirstel. As an objective reason for challenging him the prosecutor stated that Mr. Kirstel "felt the death penalty was not a deterrent." This is a mischaracterization of Mr. Kirstel's view. What he actually said was that "purely [as] a general statement" he did not believe the death penalty is a deterrent "to crime in general," explaining, "I mean in the sense that because of it crime has decreased." Surely that was an unexceptionable observation. At numerous points in the voir dire Mr. Kirstel declared himself willing and able to vote for the death penalty if it appeared on the evidence to be the appropriate penalty in the case at bar.[6]

The prosecutor next asserted that Mr. Kirstel indicated "he would be more inclined to follow his own idea of what he should be doing than he

---

[5] I shall refer herein to prospective jurors who were accepted by both parties and therefore served on the jury as "Juror _____ " or "Alternate Juror _____ ."

[6] Thus Mr. Kirstel explained to the court, "there are times when for a particularly heinous crime I might feel that it's deserved . . . I'm not either a firm believer against or for. I believe the circumstances determine." The court then asked him whether he would be reluctant to vote for death if he believed it was the appropriate penalty after hearing all the evidence; he replied, "Not if I thought the circumstances warranted it."
There is no contrary evidence in the record.

would be to follow the law from the judge." The transcript is otherwise. The court informed Mr. Kirstel, as it informed the other members of the panel, that "At the time you take the oath you don't know what the evidence is and you haven't heard the law. But you are nevertheless bound to follow the law and apply it to the case even though you may not agree with it or think it should be something other than it is," and inquired whether he had "any hesitancy about that at all?" Mr. Kirstel squarely replied, "No." He gave the same clear answer to a number of similar questions during the remainder of the voir dire. When the prosecutor pressed the inquiry, Mr. Kirstel explained that he drew a distinction between following the instructions on the law—which he declared himself fully willing and able to do—and making up his own mind on the facts—which of course would have been both his right and duty as a juror.

The only other objective reason offered by the prosecutor was that Mr. Kirstel had "someone in his family who was a lawyer . . . ." The reference is to a grandson of Mr. Kirstel who was then in practice as a workers' compensation attorney in Sacramento. The prosecutor never explained, however, how this fact could conceivably bias Mr. Kirstel either for or against either party in this case—a murder trial in San Jose. Moreover, the prosecutor voiced no such objection when he accepted Alternate Juror Marie Travis, who had much closer family ties with lawyers: her two brothers were practicing attorneys, one even having served as a criminal defense counsel.

The prosecutor's remaining reasons for challenging Mr. Kirstel were subjective. He stressed that Mr. Kirstel was "an excessive [in excess of?] seventy years old," that "He looked me to be a very tired person," that "there was a great deal of rapport between him and one of the defense counsel," that he hesitated in answering some of the court's questions, and that he was "somewhat more friendly-appearing to the defendant in the case, more so than the average juror was." Again the prosecutor did not explain any of these remarks, and none is verifiable.

The third Jewish prospective juror discussed by the prosecutor was Esther Sobel. As his first objective reason for striking her he said, "I had some feelings about her intelligence. I asked her a question about someone who's related to me that worked for Sunnyvale School District for many years and she said yes, she thought she remembered him. The person I was talking about was a female . . . she got somewhat confused, she didn't seem to be able to grasp things well." The record does not support this criticism of Mrs. Sobel. Contrary to the prosecutor's claim, Mrs. Sobel did not say "she thought she remembered" the person he asked her about; indeed, she explained that she could *not* remember particular names of her former co-

workers because it had been nine years since she had retired. In addition, the prosecutor's question operated as a trap, because he asked if she knew "Joe Gardner," a name that anyone hearing it would take to be male rather than female.[7]

Nor does the record support the prosecutor's doubts about Mrs. Sobel's "intelligence." Rather, it discloses she was a former school librarian, held not one but two master's degrees, was currently studying both Hebrew and French, was both a violinist and a violist, and played in a classical string quartet. The prosecutor did not question the "intelligence" of a number of jurors he accepted who had far fewer intellectual accomplishments; for example, several had no education beyond high school.

The prosecutor next stated, "She had real questions about—she seemed to hesitate when we got into the subject of race. . . . she said it was just not an issue with her. I had a problem with that." The record shows, however, that Mrs. Sobel did not in fact "hesitate" when asked about the subject of race; rather, she answered the relevant questions directly and succinctly, demonstrating—as the prosecutor himself described—that race "was just not an issue with her."[8] And the prosecutor never said why Mrs. Sobel's *absence* of racial prejudice was a "problem" for him, although an unflattering explanation of his motive can be conceived.

The prosecutor then referred to two instances in which Mrs. Sobel had allegedly unsatisfactory experiences with the police. First he asserted that "She said the previous police department she dealt with did not do a good job. She was very critical of them." The reference is to an instance in which Mrs. Sobel and her husband asked the local sheriff to look into certain activities of their town manager that they believed were illegal; her entire remark on the topic was, "Well, he investigated it and we felt that he didn't

---

[7] "Q. [By the prosecutor] Did you know Joe Gardner when you were at Fairoaks? A. I'm trying to remember. I don't think he was the principal then.

"Q. I'm thinking of a female."

Even if the prosecutor had meant the name "Jo" (i.e., a diminutive of "Josephine"), the name is a homonym of the more common name "Joe," and the trap remained set.

[8] "Q [By the court] Defendants are black in this case. Does that give you any concern about sitting as a juror here? A. No.

"Q. Do you have any feeling that a defendant is more likely to be guilty or to be guilty of a violent crime simply because he is black? A. No.

"Q. And you recognize that the law is colorblind in that particular? A. I do.

"Q. And the fact that they're black has no bearing whatsoever on any issue the jury has to determine? A. Yes.

"Q. And on the other hand for that reason they're not entitled to special consideration either? Do you believe that? A. Yes.

"Q. You would treat it like all other persons? A. Yes."

do a very good job." In these circumstances it is a gross exaggeration to say she was "very critical" of the sheriff's department. On the contrary, she immediately added that "whenever we've needed them they've been very helpful . . . ." Moreover, the prosecutor made no similar objection to Juror Dan Forster, who apparently had far more serious grounds to complain of the inadequacy of a police investigation: Mr. Forster's 15-year-old daughter was run down and killed in a pedestrian walkway only 6 months before this trial, and he stated on voir dire that he felt the police "should have investigated more closely whether the driver had been taking drugs or alcohol. They didn't make any attempt to determine [that fact] by blood sample or anything of that type." The driver was not charged with any offense. The prosecutor nevertheless allowed Mr. Forster to serve as a juror.

Second, the prosecutor said that Mrs. Sobel "had a trial which she apparently testified in against a police officer and she was not happy with it because the officer hadn't told the truth." The reference is to an incident in which Mrs. Sobel was given a traffic citation by a highway patrolman because he believed she had not made a sufficient stop at a stop sign; she disagreed and contested the matter, but the court accepted the officer's version of the incident. This mundane incident, however, did not so disturb Mrs. Sobel as to impair her ability to serve as an impartial juror. On the contrary, it apparently had the opposite effect, i.e., it increased her impartiality: she conceded that before the incident she had been inclined to give more credibility to a police officer's word simply because he was an officer; after the event, however, she would neither automatically believe nor disbelieve such witnesses, but would judge them on their individual merits: she explained, "I'd just listen to them carefully and compare them to whatever evidence was presented."[9]

The prosecutor's remaining reasons for excluding Mrs. Sobel were subjective. He said that "she was sixty-six years old, she also appeared to me to be a very tired-appearing person," and that "To me she gave the defendants a very sympathetic look." The prosecutor did not explain either of these remarks—which were almost identical to his criticisms of Mr. Kirstel's age and demeanor—and they too are unverifiable.

The fourth Jewish prospective juror discussed by the prosecutor was Robert Berliner. The first objective reason given for challenging him was that "he didn't seem to be willing to commit to promises to make a decision based on the facts of the evidence and that bothered me." The record shows just the opposite. Mr. Berliner assured the court that he would obey the

---

[9] In this connection it may be noted that the prosecutor conceded Mrs. Sobel "did not feel that there was anything wrong with the death penalty . . . ." Indeed, her answers on voir dire show that she actually leaned towards imposition of that penalty.

oath to "render a verdict according to the evidence received in the court-room . . . ." Specifically, he stated that on the question of imposing the death penalty "I wouldn't be categorically opposed. I would simply try to follow the evidence and my mind would be open." And he repeatedly stated that he could and would vote both for a verdict of guilty and a penalty of death if either was appropriate on the evidence.[10] The prosecutor neverthe-less pressed the point, saying, "we ask you in advance. And you don't have any hesitation in that regard, you could follow the law, follow the evidence to whatever conclusion was reached? Not knowing what the law is, not knowing what the evidence is, just promise you would follow those to a verdict, based upon them?" Mr. Berliner answered, "Yes," and the prosecu-tor went on to other matters. No ambiguity appears in such a record.

Next the prosecutor asserted that Mr. Berliner "said that sympathy would be a problem for him," and the prosecutor inferred that Mr. Berliner would be sympathetic to the defendants rather than to the victim. Neither assertion finds support in the record. The court first asked Mr. Berliner if he could follow an instruction to put aside sympathy for either the defendant or the victim in deciding guilt; Mr. Berliner observed that it would be hard to avoid having some such feelings, but said he could follow the instruction. And when the prosecutor returned to the point, Mr. Berliner made it plain that his observation was general in nature and he had no feelings of sympa-thy towards the particular defendants on trial in this case.[11]

Next the prosecutor complained that Mr. Berliner "had an atypical an-swer on the question of police officers' dealing with blacks, which made me think that the colorblindness would be a problem for him." Again the record is otherwise. There is not the slightest intimation that Mr. Berliner had a "problem" with the race of the defendants; on the contrary, in the

---

[10] Even the prosecutor conceded that Mr. Berliner "thought there should be a death penal-ty . . . ."

[11] "Q. [By the prosecutor] You mentioned also when the judge asked you that it was hard, a little hard to imagine passions and sympathies not coming up in the case. Specifically, what did you mean just in general terms? What types of things were you thinking of that made you hesitate? A. I don't know if I recall. I got the impression that the instruction was saying to be completely dispassionate and it doesn't seem to me that is possible to do.

"Q. Oh, sure. You are right. [To say] . . . that we don't have any personal feelings, any sympathies, any passions or prejudices is asking a great deal because of course we do. But they are not allowed to come into a decision on the facts of whether or not a person is guilty. Those are not part of the evidence. A. *Agreed*.

"Q. But a person who recognizes those can set those aside. Did you have some specifics of passion or sympathy you thought might come up? Something that flashed through your head? A. *No, nothing specific*. It was just the general concept of paying no mind to one's feel-ings.

"Q. Did you have it in relation to the defendants? You thought you might feel sympathy toward them or toward the victim? A. *Nothing in particular*." (Italics added.)

brief discussion of the topic he expressly said he had "No problem" with excluding racial considerations from his decision on either guilt or penalty.[12] Nor is it true that Mr. Berliner's answer to the question whether the police treat Blacks differently was, as the prosecutor claimed, "atypical." On the contrary, several of the sitting jurors likewise had no opinion on this question: like Mr. Berliner, they simply had no personal experience with the matter and declined to speculate on it. Thus Juror Reguero replied to the same question, "I really don't have an opinion," and in words virtually identical to Mr. Berliner's (see fn. 12, *ante*), said, "That all depends on who you talk to. Some people feel they are [treated differently by the police] and some people feel they are not."

Finally the prosecutor claimed, "I had some kind of question when I was finished talking to him about whether or not an engineering standard of proof, if there is any such thing, might be—well, that might be a problem." If the prosecutor was trying to say that Mr. Berliner, who was an engineer by profession, might have used an "engineering standard of proof," the record is plainly the opposite.[13]

The prosecutor's remaining reasons for excluding Mr. Berliner were subjective. He began by calling Mr. Berliner "weird," then said, "He appears odd to me, he was dressed in a fashion that I thought was somewhat different and out of the mainstream perhaps," that "He made me uncomfortable," and that "I also felt I was totally unable to relate to him while I was talking to him which made me somewhat nervous . . . ." Again the

---

[12] The entire discussion of the point on voir dire was as follows:

"Q. [By the court] Do you have any opinion as to whether police agencies treat black persons differently than other persons in any way? A. One hears claims and counterclaims.

"Q. I am asking for your opinion from whatever source, do you have as you sit there now, do you have an opinion on the subject? A. No, I don't think so.

"Q. You recognize that the law is colorblind and that the question of a person's race is entirely immaterial or irrelevant on the question of his guilt or innocence or what penalty should be imposed? A. Yes.

"Q. At the same time, persons are not entitled to any special consideration for that reason either. Do you have any problem with that? A. No problem."

The prosecutor asked Mr. Berliner no questions on this topic in his voir dire.

[13] "Q. [By the prosecutor] The judge will tell you that the standard of proof is that the case must be proven beyond a reasonable doubt, not to a scientific certainty, not beyond a shadow of a doubt as you may hear in the movies or stuff once in awhile, but beyond a reasonable doubt. If that differs from the standard that you are used to in your training, would you have any problem at all following the standard the judge gave? A. I don't think so. Have to be up to my own notion if there is a doubt, a reasonable doubt.

"Q. But you wouldn't, say, impose engineering standards over the evidence, the police work or whatever, you would just follow whatever the judge told you the standards were? A. Yes. I don't see how the engineering standard would be applicable."

The prosecutor asked essentially the same questions in his voir dire of the immediately preceding prospective juror, Dan Forster, who was also an engineer. Mr. Forster gave essentially the same answers, but the prosecutor nevertheless accepted him as a juror.

prosecutor did not further explain any of these remarks, and none is verifiable. It may be noted, however, that Mr. Berliner was evidently in the "mainstream" in certain fundamental respects: he was a computer design engineer at Hewlett Packard, where he had been employed for 10 years, and was married with a wife at home and 2 young sons.

Although the objective reasons given by the prosecutor for challenging the Jewish jurors are thus unsupported by the record, the transcript does contain a line of questioning by the prosecutor that suggests another reason why he struck each member of this group of prospective jurors. In conducting his voir dire of Mr. Kirstel the prosecutor asked, "Do you think that as a juror you would maybe be a little bit more lenient towards a black person because he's a minority?" When Mr. Kirstel observed that although he too was a minority because he was Jewish he would not thus favor defendants, the prosecutor reiterated: "Okay. But especially if you think in terms of being a minority in maybe a religious sense, you would bend over backwards a little bit for a racial minority?" Again Mr. Kirstel replied that to the best of his ability he would not do so. But the prosecutor relentlessly pressed the point: "If it came up that you thought, well, gee, you know, Jews have been [a] minority for hundreds and hundreds of years—thousands of years—and they have been oppressed at many times and the black people have been oppressed in this country and I feel sorry for the defendants because they're black, if that started coming up for you do you think you'd be able to tell—at least recognize it and do your best to set it aside?" The questions say more about the prosecutor than about Mr. Kirstel. They imply a belief that a Jew could be biased in favor of these defendants simply because of the history of oppression of the Jewish people. Such a belief, however, is precisely the kind of group bias that *Wheeler* condemns as an impermissible ground for striking the members of that group from the jury: to act on that ground is to violate the defendant's right to trial "by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution." (22 Cal.3d at pp. 276-277.)

### B. *The Black Prospective Jurors*

The first Black prospective juror discussed by the prosecutor was Serena Storey. As an objective reason for challenging her, he first said that "She's had a brother-in-law who was arrested." In *Wheeler* we noted that one of the Black prospective jurors peremptorily challenged had a stepson who was currently incarcerated on a criminal conviction, and observed that "A personal experience of this nature, suffered either by the juror or a close relative, has often been deemed to give rise to a significant potential for bias against the prosecution." (22 Cal.3d at p. 277, fn. 18.) The case at bar, however, is of an entirely different order of magnitude. Here the record

shows that the charge against Ms. Storey's brother-in-law was possession of marijuana, the arrest occurred 10 or 12 years earlier, and the punishment had been a simple fine. In these circumstances it is difficult to believe the incident caused Ms. Storey to harbor a lingering bias against the prosecution a decade later. The prosecutor apparently did not believe it either: when Ms. Storey brought up the incident during the prosecutor's voir dire he did not ask her whether it would affect her ability to deliberate in this case, although he asked that question of all prospective jurors whose family members had had potentially adverse experiences with the police.[14]

A similar exaggeration appears in the next objective reason offered by the prosecutor: "She's known many guys who have gone to jail." The implication is that Ms. Storey—in the vernacular of a bygone era—is the "moll" of a gang of hardened criminals. But the reality is much different: it is simply that 20 years earlier, when she was a teenager, a number of other teenagers in her high school were held in jail or put on probation for, as she described it, "little different things." Unfortunately this is not an unusual experience for a Black in the teenage years. Yet when a non-Black prospective juror described a similar experience, the prosecutor was not concerned and accepted her as a juror.[15]

Next the prosecutor stated, "There was a question in my mind whether she thought the courts were prejudiced against blacks." What Ms. Storey actually said, however, was that she believed the courts treated Whites more leniently than other races because Whites are the majority in this country.[16]

---

[14] Indeed, the implausibility of the prosecutor's belated concern about this minor brush with the law by Ms. Storey's brother-in-law is underscored by his apparent unconcern about more serious criminal involvement of relatives of non-Black prospective jurors. Thus one such juror had a brother who had been incarcerated for repeated drunk driving offenses and a second brother who had served a year on federal probation for interstate shipment of stolen goods. Yet the prosecutor allowed that juror to serve, accepting her assurance that the experiences would not bias her against the People.

[15] Thus Juror Kathy Heredia recounted that when she was a teenager she and her friends had been harassed by the police on a number of occasions: "It always seemed like we were being pulled over, searched, you know, the car . . . ." She further conceded that some of her teenage friends had been arrested and that a neighbor who harassed her was arrested numerous times and finally committed to the Youth Authority.

[16] "Q. [By the prosecutor] The law is colorblind when it comes to race. There is no different rule anywhere in the law based upon what race a person is. Do you have any problem at all with that concept? A. No. I don't have any problem with the concept.

"Q. Okay. The way you said that I get the feeling there's a second sentence? A. Well, I don't fully believe the statement.

"Q. Okay. Do you have a feeling that different people get treated different ways because of being different races? A. Sure. I mean it would be illogical to say anything else.

"Q. Okay. Can you give us an example of the kind of thing—A. You live in America.

" . . . . . . . . . . . . . . . . . . . . . . . . .

"Q. You're—well, let's stick to California. I take it do you feel black people get treated differently by the courts in California than yellow people or white people or—A. I would say

For *Wheeler* purposes, of course, it is immaterial whether or not that belief is well founded; what matters is that Black prospective jurors like Ms. Storey may share the belief simply because they are Black: it is a perspective "arising from their life experience in the group, i.e., a perspective gained precisely *because* they are members of that group." (*Rubio* v. *Superior Court* (1979) 24 Cal.3d 93, 98 [154 Cal.Rptr. 734, 593 P.2d 595].) Accordingly, under *Wheeler* the belief is an impermissible ground for striking Blacks from the jury: the purpose of the representative cross-section requirement "is to achieve an overall impartiality by allowing the interaction of the diverse beliefs and values the jurors bring from their group experiences. Manifestly if jurors are struck simply because they may hold those very beliefs, such interaction becomes impossible and the jury will be dominated by the conscious or unconscious prejudices of the majority." (*Wheeler*, 22 Cal.3d at p. 276.)

This is true even if the belief in question might predispose the Black prospective juror to favor Black defendants generally. As we further explained in *Wheeler*, quoting with approval from a cogent analysis of the issue, " 'Blacks may, in fact, be more inclined to acquit than whites. The tendency might stem from many factors, including sympathy for the economic or social circumstances of the defendant, a feeling that criminal sanctions are frequently too harshly applied, or simply an understandable suspicion of the operations of government. . . . But these tendencies do not stem from individual biases related to the peculiar facts or the particular party at trial, but from differing attitudes toward the administration of justice and the nature of criminal offenses. The representation on juries of these differences in juror attitudes is precisely what the representative cross-section standard elaborated in *Taylor* [v. *Louisiana* (1975) 419 U.S. 522 (42 L.Ed.2d 690, 95 S.Ct. 692)] is designed to foster.' " (22 Cal.3d at pp. 276-277, fn. 17.)

In any event, the record shows that in the case at bar Ms. Storey's belief that the courts were lenient towards Whites did *not* bias her in favor of the specific Black defendants on trial here. When the court directly asked her whether her determination of the guilt or innocence of these defendants would be affected by the fact they are Black, she replied unequivocally that it would not.[17]

---

white people are treated different from the other races in the State of California and every other state in the United States strictly because white is a majority.

"Q. Okay. And I take it you mean they have more leniency? A. Sure they do."

[17] "Q. [By the court] The fact that the defendants here are black, does that create any problem for you? A. That creates no problem for me.

"Q. You realize that has nothing to do with the question of guilt or innocence? A. That definitely has nothing to do with it."

Apparently unsatisfied with this answer, the prosecutor engaged Ms. Storey in a line of questioning reminiscent of that he had used on the Jewish prospective juror Mr. Kirstel, again raising the specter of group bias. Saying that "only you can answer this question," he asked her, "what attitude do you think you would take towards the racial question in a case such as this one if you were on the jury?" Defense counsel objected that Ms. Storey had already answered this same question when it was asked by the court, but the court allowed the inquiry because it had not yet been asked by the prosecutor. The prosecutor then amplified the question to add a reference to the "different treatments" that racial groups have experienced. Ms. Storey replied in effect that she understood prejudice because she had been exposed to it as a Black, and therefore to avoid being guilty of prejudice herself—i.e., by favoring Black defendants—"I would be more inclined to try and be as fair as possible." She stressed that "I would take a very good look though at the evidence."

Still unsatisfied, the prosecutor asked, "Well, given that maybe most people can't be dead neutral on the question of race whether they're police officers, judges, juries, whatever, I'm wondering what your own particular attitude might be that might be different if the defendants were Oriental or whites or something like that." Again Ms. Storey explained that the race of the defendants on trial was immaterial to her: "As far as being black, I deal with blacks every day. I'm aware of the good and the bad in all races."[18] Yet the prosecutor pressed relentlessly on, saying, "So you think that the fact that these defendants are black would make it a little harder for me to prove the case or a little bit easier to prove the case . . . ." Because Ms. Storey did not "think" anything of the sort, she interrupted him to declare—one more time—that "I don't think the fact that they're black in my personal situation would make any difference."

Despite the firmness, clarity, and consistency of Ms. Storey's answers on this issue, it is obvious from the prosecutor's remarks at the *Wheeler* hearing that he continued to presume she would be biased in favor of Black defendants merely because she was herself Black. That presumption, however, violates not only our *Wheeler* rule but the specific command of the United States Supreme Court in *Batson*: the high court explicitly warned that "the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defend-

---

[18] Interestingly, Ms. Storey's denial of any prejudice in favor of Blacks is given a ring of truth by her candid admission of a potential prejudice on the ground not of race but of lifestyle: "There is only one type of person and I do my best to control it, but if I was sitting on a jury for this person I would probably be inclined to be a little prejudiced because they do make me quite nervous. That would be if the person was white with long blond stringy hair and dirty. I am scared of those people and that's one of my prejudices."

ant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race. [Citations.] Just as the Equal Protection Clause forbids the States to exclude black persons from the venire on the assumption that blacks as a group are unqualified to serve as jurors [citation], so it forbids the States to strike black veniremen on the assumption that they will be biased in a particular case simply because the defendant is black. The core guarantee of equal protection, insuring citizens that their State will not discriminate on account of race, would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions, which arise solely from the jurors' race." (476 U.S. at pp. 97-98 [90 L.Ed.2d at p. 88].)

Shifting his ground, the prosecutor next stated that because Ms. Storey had divorced her police officer husband, he felt she was "very militant anti-police officers . . . ." The record shows this to be another gross exaggeration. Ms. Storey and her husband had been divorced for five years by the time of this trial, and she assured the prosecutor that "I really had no problem with him being a police officer." Although she said that "I have known policemen to lie," she explained that she meant they might lie "to their wives" on social occasions on which they claimed, for example, "an act of bravery." She never asserted that she had known police officers to lie on the witness stand. When the court asked her if she would be inclined to give a police officer's testimony less credibility because he is an officer, she replied, "No, because I did know a couple of nice policemen." When the prosecutor inquired further, Ms. Storey explained that from her marriage she learned that "being a police officer you see so much of the bad side" of human nature that many officers become bitter and hopeless, but that others "didn't allow the environment to change their minds or make them something else that they didn't start out [being]"; these police officers, she agreed, "maintained their humanity." And she reiterated that she would have no problem judging police credibility by the same standards she would apply to all witnesses. There is no other discussion of the matter in the voir dire of Ms. Storey, and the record thus does not support the prosecutor's belated claim that Ms. Storey was "very militant anti-police officers."[19]

Nor does the record support the prosecutor's further assertion that Ms. Storey "said she'd judge police credibility by vibrations. I don't know what she meant by that, but I'd have a lot of problem resting a case with a lot of police testimony on the vibrations of the police officer, those not being under my control or even being able to understand what she meant." This

---

[19] By contrast, three prospective jurors stated that some police officers will lie on the witness stand, and another three agreed that some police officers are dishonest. The prosecutor did not challenge any of these six prospective jurors, however, and allowed each to serve. None is Black.

reason for the challenge is pure fantasy. Nowhere in the transcript of her voir dire examination does Ms. Storey say she would judge police credibility—or anything else—by "vibrations."

The prosecutor's final two objective reasons for striking Ms. Storey relate to even more trivial matters. First he stated that she "said that it was bad luck to get on a jury . . . ." Again this is a bald overstatement of the record. During voir dire the court asked Ms. Storey whether she could refrain from watching television news stories about this trial if she were a juror, and she replied candidly, "Well, if I had the bad luck to get on this jury I guess I'd do that." As was his right, the prosecutor asked for the particular reason why she would rather not serve on this jury. He acknowledged that "most people don't want to get on . . . because of the amount of time that's involved," but he noted that some prospective jurors have other reasons, e.g., they "don't like the idea of sitting in judgment on other people." Ms. Storey replied that her reason was purely the former: she was a planning engineer for Pacific Telephone Company, and at that moment was "right in the middle of a great big reprogramming thing" and there was nobody else available to do her job; accordingly, if she were to serve on this jury she would have to work late on her job after the trial adjourned each day. The prosecutor asked, "In relation to this case then those are the reasons that there would be a problem. Nothing else that you can think of offhand?" She replied, "No. That would be the strain." There was no other discussion of the question. In these circumstances, as the prosecutor conceded, Ms. Storey's reluctance to serve was not unusual; more important, the record is devoid of evidence that her reluctance would have biased her against either *party* in this case, less still that it would have caused her to favor the defendant rather than the prosecution.[20]

As his final objective reason the prosecutor twice said that Ms. Storey had been "prosecuted" for allowing her son to drive her car without a license. That "prosecution," however, turns out to be nothing more than an ordinary traffic ticket. She explained that she received the citation for letting her son drive her car alone before he got his license, although he had his learner's permit at the time. The matter was resolved without even a court appearance: she paid a small fine by mail, and her son went to traffic school. Not surprisingly, the event left Ms. Storey with no resentment. The court asked her, "Is there anything about that experience which creates any problem for you, anything in your mind about law enforcement . . . ?" She candidly replied, "No, I was definitely in the wrong."

---

[20] The prosecutor expressed no such concern when Juror Marilyn Christensen also voiced a strong reluctance to serve on the jury because of the demands of her job. Mrs. Christensen is not Black, and strongly favored the death penalty.

The prosecutor's remaining reasons for excluding Ms. Storey were subjective. He said she had "a very defensive body disposition, . . . she was closing her legs and folding her arms when she was talking to me," and that when counsel were introduced to her "she wouldn't even look in my direction" and "my sense was . . . that there was some kind of hostility at that point." The prosecutor also asserted that "When the court mentioned the death penalty, I counted a pulse, because I was able to with some jurors, and did it with everyone I could from jewelry bobbing or from actually seeing veins in the neck. Her throat became very fast and her pulse came up to over a 100, what I thought was somewhat unusual."

Again the prosecutor did not further explain any of these remarks, and none is verifiable. Yet one point deserves a brief discussion. Even if we assume arguendo that the prosecutor seriously believed he had the power to take an accurate pulse just by looking at his subject, the record refutes his implication that Ms. Storey's alleged pulse rate meant she would be reluctant to impose the death penalty. When the court asked for her position on that penalty she replied, "I'd say I'm neutral. I would have no qualms about giving a death sentence if it's warranted." On voir dire by defense counsel she reiterated, "I said I'd have no problems with giving the death penalty." On voir dire by the prosecutor she returned to the subject when he asked her if she would favor Black defendants, and she volunteered the view that "Since I do not have qualms about the death penalty and I think that would apply whether the defendants were white or black." And she answered twice more in the affirmative when the prosecutor asked if she could vote for death for one defendant even if that penalty was not appropriate for the other or the other turned state's evidence.

The next Black prospective juror discussed by the prosecutor was Marcia Tamboura. As his first objective reason for excluding her the prosecutor said, "She mentioned that she doesn't follow—she reads the newspapers daily but she reads the funnies and Ann Landers. She doesn't read the news." The prosecutor's plain implication—that Mrs. Tamboura is too unintelligent or uninformed to be a juror because she voluntarily chooses not to "read the news"—is both insulting and contradicted by the record. Mrs. Tamboura did *not* say she never reads the news; what she did say was very different, to wit, that if she were to serve as a juror in this case she would follow the court's admonition to avoid reading any news reports about the trial.[21] Whether Mrs. Tamboura's mention of Ann Landers and

---

[21] The entire discussion of the point on voir dire is as follows: "Q. [By the court] Okay. In a case of this kind it's not unlikely that the news media may . . . take an interest in it while it's in trial and carry stories on it. And stories in the news media are not always accurate and do not always contain relevant information as to the case. If you were selected as a juror it

the comics was a modest attempt at humor or an expression of her preference for those popular features, her answers are entirely unremarkable. They certainly do not support the demeaning inference that the prosecutor sought to draw from them.

On this point the record again demonstrates the prosecutor's disparate treatment of the Black prospective jurors. No less than four White jurors admitted on voir dire that they intentionally avoid reading the news—i.e., the attitude that the prosecutor tried to impute to Mrs. Tamboura. Thus Juror Judith Brown declared that she does not read the news portions of the papers, only the sports pages.[22] Juror Anna Mills said she reads the newspapers only "rarely," while Juror Natalie Fleming said she does not take a newspaper at all. And Alternate Juror Tucker flatly declared "I avoid the news" because it upsets her. As to none of these four, however, did the prosecutor make the snide remark he made about Mrs. Tamboura, and he allowed all four to pass unchallenged and serve on the jury.

Next the prosecutor charged that Mrs. Tamboura "didn't approve of the death penalty." It is true that she so answered when the court asked her for her position on the penalty. But she proceeded to make it crystal clear that she would nevertheless be willing and able to vote for death in an appropriate case. First she answered in the affirmative when the court asked whether she could vote for death if the case reached the penalty phase. The prosecutor then inquired into the matter at length, and Mrs. Tamboura frankly explained her thinking as follows: "Could I vote for the death penalty, you know, where I don't really like it. And I came to the conclusion, yeah, I could. If the evidence was that that's what should be called out or if that's what the law says that I have to do, I would have to say yes. I would have to because the death penalty is a fact. My not liking it doesn't change the fact." The prosecutor asked the same question in several different ways, but Mrs. Tamboura gave the same answer each time.[23]

---

would be your duty to avoid reading anything about it in the paper or watching anything about it on the T.V. A. Just as long as I get to read Ann Landers and funny papers, it's okay.
 "Q. Okay. But do you feel you could do that, avoid reading or watching or listening to anything about it while it's in trial? A. Yes."
 [22] "Q. [By counsel for defendant] You do much reading in the daily papers? A. No—sports page is all.
 ". . . . . . . . . . . . . . . . .
 ". . . I don't read the newspapers and don't listen to much news because it makes me angry.
 ". . . . . . . . . . . . . . . . .
 "Q. [By counsel for codefendant Fields] Does news in general make you angry? A. Yeah. That's why I only read the sports pages.
 "Q. Okay. You mean you don't like politics and crime news and that kind of stuff? A. I—I just set it aside."
 [23] For example, the prosecutor asked Mrs. Tamboura, "If you decided that it was the appropriate thing under the law, but you didn't like the law, and you did have the ability, if you

The prosecutor also complained that "she said she didn't think that being black should have any bearing on the case. She didn't say it wouldn't have any, she said she didn't think it would which leaves to me the question if she sat there whether or not blackness of a defendant would make a difference in the case and that's a risk all by itself I would be very unhappy having to take." Again the prosecutor's claim is a gross exaggeration of the record. The court first asked Mrs. Tamboura its standard questions about the relevance of defendants' race, and she gave routine answers denying any bias.[24] Taken in context, her answer, "I don't think so," was not an expression of uncertainty but simply a common colloquial equivalent of "no." This fact was made plain when the prosecutor pressed the point in his voir dire and Mrs. Tamboura disabused him of any notion that she was uncertain on the issue.[25]

On this point the record demonstrates once more the prosecutor's disparate treatment of Black prospective jurors. Virtually every one of the jurors who were allowed to serve also answered with similar affirmative (or negative) colloquialisms, viz., "I think [or "don't think"] I could," "I believe [or "don't believe"] so," "I feel [or "don't feel"] I could," etc. (See, e.g., fn. 37, *post*.) Yet the prosecutor challenged none on this ground. For example, Alternate Juror Travis answered in such terms far more often than Mrs. Tamboura, but the prosecutor was unperturbed. Thus when he inquired if

wanted to, to vote for the other even though it wasn't appropriate, do you know what you'd do?" She replied, "I don't think that I would vote against it because I didn't like it, okay? The law is the fact. And there are a lot of facts I don't like." Again the prosecutor asked, "You come down to the point where you think the law and the facts make it appropriate to vote for the death penalty. Your moral stand, your view towards the whole thing is that you shouldn't do that. You would be willing to follow the law?" She replied simply, "I have to follow the law." Finally Mrs. Tamboura assured the prosecutor that her feeling about the death penalty would not affect her deliberations either on guilt or special circumstances.

[24] "Q. [By the court] Okay. The defendants here are black. Does that give you any problem as far as being fair and impartial in this matter? A. I don't think so.

"Q. All right. You realize that that fact has no bearing on the person, whether they're guilty or innocent or anything regarding the merits of the case. Do you understand that? A. Yes.

"Q. And do you believe that? A. Yes."

[25] "Q. [By the prosecutor] The way—sometimes the way people answer questions makes attorneys' antennas arise just by what they said. You were asked by the judge if you thought it would have any bearing on the case if the defendants were black. And you answered no, but by doing so you said that, 'I don't think that would have anything to do [with] it.' When you say that our antenna goes up. I'd ask you to expand on that, if you would. A. I don't know. I don't see people as black and white. I see them as people. So what bearing does color have?

"Q. Well, according to the law and according to the way the law is structured it has absolutely no bearing at all, but the reason I ask that is you didn't say no, you said, 'I don't think so.' And it made me wonder if you had anything else you wanted to say. A. No.

"Q. Okay. Race, age of the defendants, their personalities in court, those sorts of things for the purposes of guilt or innocence are totally irrelevant. Do you have any problem with that idea? A. No."

Mrs. Travis could disregard personal feelings in deliberating on guilt, she replied, "Yes, I think so." He asked for a clarification, and she explained that she meant, "I would hope I can do that. . . . I would try my best." Even though her explanation was far more tentative than Mrs. Tamboura's, the prosecutor immediately accepted it, saying, "That is the only kind of commitment I can ask." Moments later he inquired if she could vote to convict the two defendants even if a third had turned state's evidence, and she replied, "I think so." He responded, "Again, I assume when you say, 'I think so,' it is kind of a figure of speech?" Yet when Black prospective juror Tamboura said exactly the same words the prosecutor no longer took them as a figure of speech, but claimed instead they must be taken literally. The incident is revealing.

The prosecutor also pointed to several occasions on which Mrs. Tamboura had had contacts with law enforcement officers; presumably he mentioned them because he inferred that they had biased her against the police. The record will not bear the inference. First he said, "she had fought a traffic ticket and testified against the police officer." The record shows, however, that the incident was a routine case of Mrs. Tamboura and a police officer disagreeing over the moment at which a yellow traffic light turned red as she was driving through an intersection. Not surprisingly, Mrs. Tamboura stated that the incident left her with no bias against the honesty or credibility of police officers.[26]

Even more trivial were the other incidents listed by the prosecutor. He said, "She mentioned that there was some incident with the police officer, a BB gun, I think it was, the neighbor's, not her own kids." Again the prosecutor got the facts wrong: the record shows that it was Mrs. Tamboura's son who was shooting his BB gun in his own backyard, and it was the neighbor who called the police. But the affair was a nonevent at best: Mrs. Tamboura explained that the neighbor "was worried about her windows, which I don't blame her [for]." The incident occurred more than a year before this trial, and did not result in any court proceedings: the officer simply told her son to shoot his BB gun in open fields rather than in the city. Both the court and the prosecutor expressly asked Mrs. Tamboura

---

[26] "Q. [By the prosecutor] What kind of thing was it? A. He said I ran a red light, and I said I didn't run a red light.

". . . . . . . . . . . . . . . .

"Q. Was it a question of whether or not it had turned from yellow to red and you'd made it through or—A. Right.

"Q. Okay. Did that give you any feeling to you personally of the honesty of police officers, for instance? A. No. I don't think so. I think police officers are people.

"Q. Okay. Do you think they're any more credible than the average citizen because they're officers or any less credible because they are? A. No."

whether the incident created "any problem for you as far as law enforcement is concerned," and she squarely replied to both that it had not.[27]

Next the prosecutor said, "She had a ticket on a Christmas Eve that she didn't like and remembered he gave her a problem." It is true Mrs. Tamboura received a ticket on Christmas Eve, but the rest of the prosecutor's statement is contradicted by the record. On voir dire by the court Mrs. Tamboura denied that she felt the ticket was unjustified or that the incident would affect her deliberations in this case. And contrary to the prosecutor's belated claim that Mrs. Tamboura "remembered [the officer] gave her a problem," at the time of the voir dire even the prosecutor recognized that the incident was "most trivial" and probably not something she "had thought about much" since it had happened, and Mrs. Tamboura explained it simply made her laugh.[28]

As his final objective reason for challenging Mrs. Tamboura the prosecutor said, "She had been a witness in a manslaughter case and my best recollection is now that it was not in favor of the People . . . ." Once again the prosecutor's "best recollection" is flatly contradicted by the record. Far from being a witness for the defendant in the manslaughter case, it was Mrs. Tamboura herself who initiated the prosecution. She had been hired as a babysitter, and found the child in a state of near-starvation. It was she who called the police, and when the child died its mother was charged with manslaughter. Mrs. Tamboura testified against her at the trial, and the mother berated her in open court. Moreover, the event occurred when Mrs. Tamboura was a teenager, 20 years before the present trial, and she assured the court that it would not affect her deliberations in the case at bar. In any event, of course, if the experience had any effect it would have tended to bias her in favor of the prosecution rather than the defense.

The prosecutor's remaining reasons for excluding Mrs. Tamboura were subjective. He said he felt "somewhat generally" that she was "an overweight person," and "that her hair was poorly groomed, that her clothes were unkept [sic], giving me an indication of not being part of perhaps the mainstream of people's thinking." He also claimed "She was very nervous

---

[27] The prosecutor expressed no such concern when Juror Dolores Chaidez disclosed a similar but more aggravated experience: for the previous 18 years several of her neighbors had been harassing her family, and she had been obliged to call the police "lots of times" and eventually obtain a restraining order against them. The prosecutor did not challenge her, however, on this or any other ground.

[28] "Q. [By the prosecutor] You mentioned here a matter which I assume is most trivial, but the traffic ticket on Christmas Eve. I take it that that matter is not something that you have thought about much ever since it happened? A. I ran—evidently I pulled a Hollywood stop and ran a red light. It was about three o'clock in the morning and he said, 'have a nice Merry Christmas,' and I had to laugh."

about the death penalty" because "she was breathing very fast about it," and that he inferred she was not telling the truth or being open and candid in her answers because "she kept her hand over her mouth" when she talked about the penalty. Lastly he asserted that "She was somewhat charming with some counsel and I felt somewhat the reverse with me," that "She didn't appear to relate to me," and that "I got the feeling she didn't trust me, again for reasons unknown." The prosecutor did not further explain these observations, and none is verifiable.[29]

## C. *The Asian Prospective Jurors*

The first Asian prospective juror discussed by the prosecutor was Sharon Fukada. As an objective reason for striking her, he said she "did not approve of the death penalty, was strong about that . . . ." As a summary of Ms. Fukada's view the statement is both exaggerated and incomplete. Although she did not approve of the death penalty, she was certainly not "strong" in that belief: she repeatedly assured the court that she would not be reluctant to vote for death if it was the appropriate penalty under the evidence and instructions in this case. She reiterated that position several more times in close questioning by the prosecutor. Indeed, when asked by him for an example in which she could vote for death, she suggested felony-murder rape; and she expressly stated she would not automatically vote for life in a felony-murder robbery, which was the People's theory in the case at bar.

Next the prosecutor complained that "she said she couldn't pass judgment." The record is otherwise: Ms. Fukada did not say she was unable to pass judgment under any circumstances; she explained rather that "It is hard for me to say I could [judge the defendants] right now," because she had not heard the evidence and the law. But when the prosecutor made clear that she could answer in the abstract, she stated she would be able to vote to convict if the facts warranted it. The prosecutor asked if she was "sure about that" and she replied, "I would say that I am sure."

The prosecutor was not similarly troubled, moreover, by other jurors who were initially uncertain whether they could pass judgment in this case. For example, Juror Mary Heinrich repeatedly voiced grave doubts whether she would be able to vote at all on the issue of penalty: she had previously served on a jury in a murder case in Alaska, and even though that state does not have a death penalty she found it "a hard and traumatic experience"

---

[29] Defendant concedes that at least some of the reasons given by the prosecutor for excusing the third Black prospective juror—i.e., his criminal record, his views on police treatment of Blacks, and his acquaintance with prison inmates—were supported by the record and could give rise to a specific bias against the prosecution in this case.

that left her very loath to "play God." During a long and arduous voir dire on this single issue by the court, by defense counsel and by the prosecutor, Mrs. Heinrich answered time after time that she simply did not know if she could sit in judgment on this case. Under continued questioning she eventually said she "probably" could do so; and it was only when the court insisted on an unqualified answer that she affirmatively stated—with obvious reluctance—that she could pass judgment. Despite this performance the prosecutor allowed Mrs. Heinrich to serve as a juror.

As his final reason for striking Ms. Fukada the prosecutor charged that she had "some trouble understanding" the questions on voir dire, and either had a "language difficulty" or "there might have been an intelligence problem." This harsh criticism finds little or no support in the record. It is true Ms. Fukada candidly admitted that when the questions are lengthy "I get lost along the way." But this is not unusual, as shown by the fact that the prosecutor immediately acknowledged to her, "I have a tendency to do that myself." A number of the questions asked of Ms. Fukada were indeed long and complicated, involving legal procedures unfamiliar to laypersons[30] still other questions were, to put it charitably, awkwardly phrased.[31] In the circumstances Ms. Fukada's answers were as prompt and direct as could reasonably be expected of a layperson called to serve on her first jury—in a trial, moreover, in which two defendants were charged with capital crime. The court and counsel also found it necessary to rephrase or explain many of the questions they asked of other prospective jurors, including most of those selected to serve. There is nothing to distinguish Ms. Fukada in this respect.

Nor are the prosecutor's speculations about a "language difficulty" or an "intelligence problem" plausible on this record. Although of Japanese descent, Ms. Fukada was born and raised in Mountain View and Watsonville, attended two years of community college in Southern California studying

---

[30] In one question, for example, the court summarized the whole procedure governing capital trials, both guilt and penalty phases, and asked Ms. Fukada if she understood it; the question covers an entire page of the reporter's transcript. Another question described five different positions that prospective jurors might take towards the death penalty, and asked Ms. Fukada which was hers; this question covers the better part of a page. As it happens, Ms. Fukada was able to answer both questions without difficulty.

[31] For example, in an effort to learn more about Ms. Fukada's position on the death penalty, the prosecutor asked her the following question: "Q. If you had a choice, let's say, someone said, well, Miss Fukada, we are going to let you vote on the death penalty for all California, you would vote against it. You would eliminate the death penalty, you would vote against it if you had a choice?

"Let me ask that a different way.

"What I meant was if we had an election today as to whether or not to get rid of it and someone would say, we will let you decide, you would vote against it being used in this state?"

animal health technology, at the time of trial was attending Foothill Community College studying accounting, and had worked for four years in the accounting department of Fairchild.

The only subjective reasons offered by the prosecutor for striking Ms. Fukada were that she seemed "very shy" and "perhaps even younger" than her age (26), and "I noticed [her] staring off when being questioned by the court." The prosecutor did not further explain these reasons, and none is verifiable.

The second Asian prospective juror discussed by the prosecutor was Miranda Wong. As an objective reason for the challenge[32] the prosecutor said she "preferred . . . life without possibility of parole." The facts are not so simple. Ms. Wong explained that largely because of her religious education she used to believe that all murderers deserved to die, but that she now leaned more towards life imprisonment because of problems of proof. Nevertheless she assured the court several times that she would not be reluctant to vote for death if it was the appropriate penalty under the facts and the law. She reiterated this assurance to the prosecutor, and also agreed that she could vote for death for one defendant even if that penalty was not appropriate for the other. Her assurances were identical to those given by other jurors preferring life imprisonment, which were accepted by the prosecutor.

Next the prosecutor complained that "she mentioned that she was concerned that the case be proven without any doubt." The record is to the contrary. The prosecutor went into the matter at length in his voir dire, reviewing with Mrs. Wong the difference between the law's standard of proof beyond a reasonable doubt and the higher standard of "scientific proof." He illustrated the point by reference to Mrs. Wong's job as a laboratory technician analyzing blood samples: if she was uncertain of a result in her work she could draw another sample and run the test again or run it differently, whereas as a juror she would have to reach her decision on the fixed quantity of evidence presented to her; for this reason her standard of proof as a juror could not be scientific certainty but proof beyond a reasonable doubt. Mrs. Wong immediately understood, and agreed that "I think my work and this case are two different things." She restated the difference in her own words, and the prosecutor commended her for giving "an accurate summation" of the matter. She then assured him she would have no problem with applying the law's standard of proof beyond a reasonable doubt in this case, and he appeared to accept that assurance.

The prosecutor next gave as a reason for challenging Mrs. Wong that "she felt it was hard to judge someone." The record shows that although

---

[32] The prosecutor gave no subjective reasons for striking Mrs. Wong.

she first said it would be hard to do so, she immediately told the court she would be able to judge when it was needed.[33] In his voir dire the prosecutor returned briefly to the topic and asked, "Would it make you feel bad to have to decide who's telling the truth and who isn't?" Mrs. Wong squarely replied, "No." The prosecutor then dropped the subject, agreeing with her that "You mentioned that it was hard to judge someone, which, of course, is true, it is." Mrs. Wong's actual position on this point was thus entirely unremarkable, and was shared by many of the jurors subsequently selected to serve.

Finally the prosecutor complained, "She contested a speeding ticket against a police officer and apparently lost that ticket and she had some feeling about that." Again the prosecutor grossly exaggerated the significance of the incident. The record shows that about two years before this trial Mrs. Wong received a ticket for speeding, and went to traffic court to tell her side of the story. The arresting officer did not appear. She admitted she had been speeding, and disagreed only on how much faster than the limit she had been driving.[34] Because it was a first offense, the court was lenient; and contrary to the prosecutor's claim that "she had some feeling" about the outcome of the incident, the record shows that Mrs. Wong harbored no resentment whatever that could have biased her against the prosecution in this case.[35]

More important, the fact that the prosecutor mentioned the incident at all as a reason for striking Mrs. Wong is further proof of the disparate treatment he accorded these minority prospective jurors. As we have seen, he also singled out prior traffic tickets as reasons for striking Jewish prospective juror Sobel and Black prospective jurors Storey and Tamboura. Yet

---

[33] "Q. [By the court] Do you think you'd have any difficulty sitting in judgment on other persons, sitting as a juror? A. I think it would be hard to judge.
"Q. It would be hard? A. Yes.
"Q. But do you think you'd be able to do that? A. Yeah, I think I would. But I think it's hard to judge someone.
"Q. Okay. But as a juror in effect you're required to do that. A. M-hm.
"Q. Do you feel you could do that? A. Yeah.
"Q. All right."
[34] "Q. [By the prosecutor] Do you think you were under the speed limit? A. No. I don't think I was under the speed limit, but I don't think I was speeding that fast. . . .
". . . I think I may be speeding. A lot of times I feel like I may be guilty, but I don't think it was that far out."
[35] "Q. [By the court] Have you had any other contact with law enforcement? A. No, that's the only one, I only got one ticket. I told the judge that's the first ticket I ever got in my whole life so he said instead of fining $40, fine $20. Something like that. I can't remember the exact detail.
"Q. Okay. All right. But that wouldn't have any influence on what you would do here as a juror in any way? A. No."
There is no contrary evidence in the record.

the record reveals that of the 14 empaneled jurors and alternates who were asked the same question, no less than 11 admitted they had also received traffic tickets, and in each case the prosecutor was unconcerned by the incident and accepted the juror's assurance that it would not bias him or her in the present trial. Perhaps the most dramatic example was that of Juror Reguero, who admitted on voir dire that (1) in 1970 or 1971, while driving under the influence of alcohol, he struck and injured a person; (2) he was arrested by a policeman who handcuffed him behind his back while taking him into custody; (3) although the offense was a felony, his attorney obtained a reduction of the charge to a misdemeanor; (4) he was again arrested for drunk driving only six months before the present trial; (5) he felt the second arrest was a "bum rap" because although he had had "probably three drinks" he did not think he was legally drunk;[36] (6) his attorney obtained a reduction of the charge to reckless driving; and (7) the incident cost him $200 for the fine, $60 to release his car from impound, plus, as he put it, "six hundred bucks for the attorney. I thought that was a bummer."

Despite these repeated expressions of resentment by the juror, the prosecutor accepted at face value his assertion that the experiences would not bias him against the People.[37] Indeed, the prosecutor brushed the whole matter aside with the remark, "We all get a traffic ticket once in awhile." Yet his tolerance in this respect was highly selective: when Jewish prospective juror Sobel and Black prospective jurors Storey and Tamboura and Asian prospective juror Wong admitted to receiving traffic tickets for much less serious offenses and likewise said the incidents would not bias them against the People, the prosecutor refused to accept their assurances and cited their tickets as a reason for striking them from the jury.

### III

Our decisions furnish ample guidance for determining the legal consequences of this factual record. Because *Wheeler* prescribed for the first time the procedure that now bears its name, the prosecutor in that case had no occasion to offer reasons to rebut the prima facie case of group bias there shown. In four cases since *Wheeler,* however, we have been called upon to review such reasons, together with rulings of trial courts accepting them as sufficient.

First, in *People* v. *Johnson* (1978) 22 Cal.3d 296 [148 Cal.Rptr. 915, 583 P.2d 774] (hereafter *Johnson*), we impliedly accepted as true the prosecu-

---

[36] As the juror stated on voir dire, "I figured it was a bum rap. I figured, shit, I deserved it a lot of time[s] but not this time, you know."

[37] "Q. [By the prosecutor] . . . do you think in any way that would make my job harder, the two stops you got for driving under the influence? A. No, I don't feel so. I don't think so."

tor's explanation that he believed no Black prospective juror in that case could be unbiased because there would be testimony that prosecution witnesses had referred to the defendant as "the nigger." But we nevertheless held that explanation insufficient as a matter of law, reasoning that it amounted to "decision-making by racial stereotype" (*id*. at p. 299) because it presumed that every Black prospective juror would be unable to weigh such testimony objectively. "This is precisely the kind of group bias that *Wheeler* holds constitutionally insufficient to support a peremptory challenge." (*Id*. at p. 300.) We therefore reversed the judgment.

Second, in *People* v. *Hall* (1983) 35 Cal.3d 161 [197 Cal.Rptr. 71, 672 P.2d 854] (hereafter *Hall*), the prosecutor offered several objective reasons purportedly based on the backgrounds of the Black jurors he had challenged. We stressed (at p. 167) that the trial court must "satisfy itself that the explanation is genuine," and held (at p. 168) that although the prosecutor gave an explanation for his challenges, "it is apparent that the court made no serious attempt to evaluate that explanation for the purpose of determining whether it was bona fide. In fact, the record itself contains ample reason to suspect that it was not." We explained that some of the reasons the prosecutor gave were contradicted by the record, and others could have applied equally to non-Black jurors whom he did *not* challenge. (*Ibid*.) We reasoned that "Such disparate treatment is strongly suggestive of bias, and could in itself have warranted the conclusion that the prosecutor was exercising peremptory challenges for impermissible reasons." (*Ibid*.)

We concluded that "particularly in that light" the prosecutor's explanations "demanded further inquiry on the part of the trial court," but we observed that "the trial court apparently considered itself bound to accept all of the prosecutor's explanations at face value" (35 Cal.3d at pp. 168-169). We therefore held that "Such abdication is inconsistent with the court's obligations under *Wheeler*, and on authority of that case must be held to constitute error requiring reversal." (*Id*. at p. 169.)

Third, in *People* v. *Trevino* (1985) 39 Cal.3d 667 [217 Cal.Rptr. 652, 704 P.2d 719] (hereafter *Trevino*), the prosecutor offered both objective and subjective reasons for the challenges in question. We began by recalling the teaching of *Wheeler* (22 Cal.3d at p. 284, fn. 32) that "the issue in such event is not his 'judgment' or 'sincerity' but simply whether his ground of challenge was a specific bias on the part of the individual juror," and that specific bias is a ground that is "reasonably relevant to the particular case on trial or its parties or witnesses" (*id*. at p. 282).

Applying that test, we held (39 Cal.3d at p. 689) that the trial court in *Trevino* confused "specific reason" (for a challenge) with "specific bias"

(against a party). The trial court denied the *Wheeler* motion because it found that the prosecutor had stated "specific reasons" for his challenges—primarily the youth and immaturity of the prospective jurors in question. After reviewing the record, however, we concluded that the prosecutor's specific reasons did not amount to specific bias within the meaning of *Wheeler*. We found some of those reasons unsupported by the record;[38] and as in *Hall,* we observed that other reasons he gave were equally applicable to jurors whom the prosecutor did not challenge. On this record we concluded that most of the challenged minority jurors "were excluded for reasons other than those presented to the court" (*id.* at p. 692); indeed, we found the prosecutor's reasons were "scarcely more believable than those we rejected in *Hall*" (*ibid.*). We therefore reversed the judgment.

Fourth, in *People* v. *Turner, supra,* 42 Cal.3d 711 (hereafter *Turner*), the prosecutor offered objective reasons for challenging three Black prospective jurors. Applying the analysis of *Hall* and *Trevino,* we first held that the record did not support the prosecutor's proffered explanations. He complained that the first Black prospective juror "had a great deal of difficulty" in understanding the questions on voir dire. (*Id.* at p. 722.) We found, rather, that the relevant portions of the transcript "cast grave doubt on the plausibility of the prosecutor's explanation" (*id.* at p. 725); we observed that the prospective juror in fact exhibited little or no hesitation in his answers, and that other jurors responded in the same way—one of whom was accepted by the prosecutor.

Citing *Hall* (35 Cal.3d at p. 168), we concluded as to the second Black prospective juror that "the record contains 'ample reason to suspect' that the proffered explanation was not bona fide." (42 Cal.3d at p. 725.) The prosecutor had objected to the prospective juror's job in hospital administration, but on voir dire failed to ask her any questions about that job: "Absent such inquiry, we can conceive of no reason why [the prospective juror's] position in hospital administration should give rise to a specific bias against the prosecution." (*Id.* at p. 726.)

The prosecutor's stated reason for striking the third prospective Black juror was that "she could not sit impartially because she was a mother of children" (42 Cal.3d at p. 726). After reviewing the voir dire we concluded that "we have little confidence in the good faith of his proffered explanation." (*Id.* at p. 727.) We reasoned that the prosecutor's concern about partiality "is belied by the juror's assurance to the court that she would be able to listen to the evidence and reach a just verdict on the facts and the

---

[38] Despite his purported concern about the prospective jurors' youth, "the district attorney made no effort to determine the jurors' ages on voir dire nor did he inquire into any age-based biases the jurors might harbor." (39 Cal.3d at p. 691.)

instructions." (*Ibid.*) And we explained (*ibid.*) that "In light of [the prospective juror's] statement that she could indeed serve as a juror, she may have meant only that she was uncomfortable with the nature of the case—a feeling that other jurors naturally expressed as well." In that connection we noted that "a number of White prospective jurors also had children but were not challenged by the prosecutor." (*Id.*, fn. 15.)

Turning to the ruling of the trial court, we held that "the inadequacy of the prosecutor's reasons was compounded by the court's apparent acceptance of those reasons at face value." (42 Cal.3d at p. 727.) The court listened to the prosecutor without question and denied the *Wheeler* motion without comment. Yet particularly because "the prosecutor's explanations were either implausible or suggestive of bias," they " 'demanded further inquiry on the part of the trial court' [citation], followed by a 'sincere and *reasoned*' effort by the court to evaluate their genuineness and sufficiency in light of all the circumstances of the trial" (*id.* at p. 728, quoting from *Hall* at pp. 169 & 167 of 35 Cal.3d). Again quoting *Hall* (*id.* at p. 167), we admonished that "Each step is 'imperative, if the constitutional guarantee is to have real meaning' [citation]." (42 Cal.3d at p. 728.) We therefore reversed the judgment on the grounds (*ibid.*) that "as in *Trevino* the prosecution failed to sustain its burden of showing that the challenged prospective jurors were not excluded because of group bias (39 Cal.3d at p. 693), and as in *Hall* the court failed to discharge its duty to inquire into and carefully evaluate the explanations offered by the prosecutor (35 Cal.3d at pp. 168-169)."

IV

These holdings apply a fortiori to the facts of the case at bar. First, as the transcript of the voir dire demonstrates (part II, *ante*), the record does not support the objective reasons offered by the prosecutor for his peremptory challenges of the eight minority prospective jurors. Instead the record shows, as we have seen, that each of his stated reasons suffers from one or more of the following defects: either (1) the statement lacks factual support; or (2) the statement is directly contrary to the facts; or (3) the statement omits material facts, e.g., it ignores significant explanations or assurances given by the prospective juror; or (4) the statement misstates the facts, e.g., it misrepresents the prospective juror's position on the issue; or (5) the statement exaggerates the facts, e.g., it inflates the significance of trivial or remote and half-forgotten incidents; or (6) the statement discloses group bias as a matter of law. The record further shows that many of the prosecutor's stated reasons applied equally or even more appropriately to other prospective jurors whom he did *not* challenge, and that he accepted from such jurors explanations and assurances identical to those he rejected when

given by the minority prospective jurors whom he struck. Accordingly, under *Johnson, Hall, Trevino,* and *Turner,* the prosecutor's objective explanations are insufficient to rebut the prima facie case of group bias shown by the record and found by the trial court.

Second, the prosecutor's subjective explanations are also insufficient for the purpose. (*Trevino,* 39 Cal.3d at p. 692, fn. 25.) It is true that in *Wheeler* we recognized that peremptory challenges have traditionally been triggered by evidence suggestive of bias ranging "from the obviously serious to the apparently trivial, from the virtually certain to the highly speculative." (22 Cal.3d at p. 275.) By way of examples, we acknowledged that jurors have been struck "simply because [their] clothes or hair length suggest an unconventional lifestyle," or even—quoting from Blackstone—because of the juror's " 'bare looks and gestures,' " e.g., because "upon entering the box the juror may have smiled at the defendant" (*ibid.*). We explained that in the usual case these subjective reasons "are essentially neutral with respect to the various groups represented on the venire," and therefore "peremptory challenges predicated on such reasons do not significantly skew the population mix of the venire in one direction or another; rather, they promote the impartiality of the jury without destroying its representativeness." (*Id.* at p. 276.)

This reasoning is undoubtedly valid as far as it goes, i.e., unless and until the trial court on motion finds the defendant has made a prima facie case[39] that the prosecutor is using his peremptory challenges to deprive the defendant of his state constitutional right to a jury drawn from a representative cross-section of the community or his federal constitutional right to equal protection of the laws. That finding fundamentally alters the situation. After the finding, the prosecutor's peremptory challenges of the minority jurors are presumptively unconstitutional: "At this point the statutory provision that 'no reason need be given' for a peremptory challenge (Pen. Code, § 1069) must give way to the constitutional imperative: the statute is not invalid on its face, but in these limited circumstances it would be invalid as applied if it were to insulate from inquiry a presumptive denial of the right to an impartial jury. [¶] That right is paramount because the peremptory challenge is not a constitutional necessity but a statutory privilege." (*Wheeler,* 22 Cal.3d at p. 281, fn. 28.) To overcome this presumptive unconstitutionality the prosecutor must establish that the challenges in question were in fact exercised on grounds of specific bias rather than group

[39] To avoid cumbersome locutions I shall refer to the party making the *Wheeler* motion as "the defendant" and his opponent as "the prosecutor," even though these roles may occasionally be reversed. (*Wheeler,* 22 Cal.3d at p. 282, fn. 29.) The United States Supreme Court left open the question whether a prosecutor can make a *Batson* motion. (*Batson,* 476 U.S. at p. 89, fn. 12 [90 L.Ed.2d at pp. 82-83].)

bias; the trial court must then make a finding on the ultimate issue, i.e., whether the prosecutor has sustained his burden of justification; and if it finds that he has, the court will deny the *Wheeler* or *Batson* motion and the defendant will be tried by the jury thus chosen.

If the defendant is convicted, he will be entitled to appellate review of the *Wheeler* or *Batson* ruling in his appeal from the judgment. (Pen. Code, § 1259.) The importance of such review is demonstrated by the fact that an incorrect *Wheeler* or *Batson* ruling is among the very few errors that are prejudicial per se. (*Wheeler,* 22 Cal.3d at p. 283; *Batson,* 476 U.S. at p. 100 [90 L.Ed.2d at p. 90].) As we explained in *Wheeler,* " 'The right to a fair and impartial jury is one of the most sacred and important of the guaranties of the constitution. Where it has been infringed, no inquiry as to the sufficiency of the evidence to show guilt is indulged and a conviction by a jury so selected must be set aside.' [Citations.]" (22 Cal.3d at p. 283.) Meaningful appellate review of *Wheeler* or *Batson* rulings is obviously essential to protect that right. And it is all the more essential because the ruling in issue is largely discretionary. (*Wheeler,* 22 Cal.3d at p. 282; *Batson,* 476 U.S. at p. 100, fn. 21 [90 L.Ed.2d at p. 89].) "At a stage of [jury] selection that involves the exercise of discretion both by counsel and by the trial court, judicial review is the best guarantee of due process." (Note, *The Cross-Section Requirement and Jury Impartiality* (1985) 73 Cal.L.Rev. 1555, 1594.) This is so, of course, because in making a discretionary ruling the trial court by definition finds less guidance in the law and hence may run a greater risk of error. It is true that appellate review of such rulings is often more difficult for the same reason. But the solution is to strengthen, not weaken, the process of appellate review: "Rather than abandon meaningful review of decisions made in the discretionary phase of juror selection, the judiciary should maximize the extent to which exclusions must turn on reviewable elements." (*Id.* at p. 1593.)

The primary element of all appellate review is the record. Without a record sufficient for its needs an appellate court cannot even begin to discharge its constitutional and statutory duties. In the present case the record is adequate to enable us to determine whether there is factual and legal support for the prosecutor's objective reasons for striking the eight minority prospective jurors. (Part II, *ante.*) But the record is wholly inadequate to allow us to make the same determination as to his subjective reasons. Thus there is no record whatever to support the prosecutor's claims that Mrs. Smalley was a "very nervous person" and gave the defendants a "very noticeable smile"; that Mr. Kirstel was a "very tired person" and "friendly-appearing" towards the defense; that Mrs. Sobel was a "very tired-appearing person" and gave the defendants a "very sympathetic look"; that Mr. Berliner was "weird" and dressed "out of the mainstream," and that the

prosecutor was "unable to relate" to him; that Ms. Storey had a "very defensive body disposition," did not look at the prosecutor when introduced, and had a pulse of over 100 when discussing the death penalty; that Mrs. Tamboura was an "overweight person" with "poorly groomed" hair and "unkempt" clothes, was "breathing very fast" when discussing the death penalty, and "didn't appear to relate" to the prosecutor; and that Ms. Fukada seemed "very shy."

Indeed, the record was inadequate for this purpose even at the trial level. After the prosecutor gave his reasons the court offered defense counsel the opportunity to respond. Counsel for codefendant replied that "obviously" he was unable to discuss the prosecutor's "feelings about this, that and the other," and that the "off-hand impressions" of the prosecutor "cannot be controverted at all." Counsel for defendant agreed that "much of the impressions, statements and reasons are not reflected by the record, and they concern jurors that have been passed for cause." Although the prosecutor insisted that most of his reasons were on the record, he conceded that "The ones obviously of the feeling[s] against the parties are not necessarily on the record . . . ." Expressing his frustration, counsel for codefendant concluded by explaining, "Your Honor, this is one of the problems, and I see it increasingly as we have played out this motion, is that [the prosecutor] now can use all kinds of out-of-the-record reasons for doing this, that and the other, which are totally unrebuttable. . . . I think it's impossible for me to recall whether somebody smirked at [the prosecutor] or not or whether somebody gave a smile to one of the rest of us. Who knows? But this is the problem." The court ignored the problem and proceeded to rule on the motion.

As an appellate court, however, we cannot ignore the problem. Just as the lack of a record prevented defense counsel from controverting the prosecutor's subjective reasons, so too it bars us from holding those reasons to be adequate. We cannot presume that one party's recollection of the facts is necessarily more accurate than the other's. For example, in argument on the motion the prosecutor reiterated his charge that Mrs. Tamboura was "very poorly groomed"; but counsel for codefendant disputed that claim, and told the court that "I don't recall [Mrs.] Tamboura being disheveled . . . ." Moreover, the record that we do have demonstrates that the prosecutor's memory of the facts underlying his objective reasons was faulty in a number of instances (part II, *ante*); we cannot presume that his memory somehow became infallible when he recited the far more elusive facts on which he based his subjective reasons. Nor can we presume that the trial judge independently recalled the facts in the same way as the prosecutor: during voir dire the judge had no knowledge of the prosecutor's reasons for his peremptory challenges, and hence had no incentive to note or remember

any distinguishing characteristics of the jurors challenged; and in any event his memory was evidently subject to the same human frailties as the prosecutor's.[40]

It is not enough to say, as do the majority, that we should give great deference to the trial courts' rulings on *Wheeler* and *Batson* motions. The law is replete with instances in which appellate courts defer to the discretion of trial courts yet insist on a record for the purpose of determining whether that discretion was lawfully exercised. One of the most common examples is a motion invoking the trial court's discretion to exclude admissible evidence if its prejudicial effect substantially outweighs its probative value. (Evid. Code, § 352.) Even though appellate courts give great deference to the rulings of trial courts on such motions, it is settled that in each case "the record must affirmatively show that the trial judge did in fact weigh prejudice against probative value," and the admission of such evidence without making that record is error. (*People v. Green* (1980) 27 Cal.3d 1, 25-26 [164 Cal.Rptr. 1, 609 P.2d 468]; accord, *People v. Burgener* (1986) 41 Cal.3d 505, 527 [224 Cal.Rptr. 112, 714 P.2d 1251].)

In the present context, it is the prosecutor who has the burden of making a showing that overcomes the prima facie case of discrimination found by the trial court. It is therefore also the prosecutor who must make a record of such showing that is adequate for appellate review. Indeed, he is the only party able to do so, because only he knows why he is challenging each particular juror. Having both the duty and the opportunity to make the necessary record, the prosecutor must be held responsible for its absence.

We adopted the *Wheeler* rule because we recognized our responsibility to insure that the constitutional right to a jury drawn from a representative

---

[40]For example, at the outset of the *Wheeler* hearing a dispute arose between the parties as to whether Mrs. Tamboura was Black or Indian. The judge intervened, saying, "I recall the juror. She said she was of Indian extraction." Defense counsel had earlier suggested the parties stipulate that Mrs. Tamboura was of the race she listed in her questionnaire, i.e., Black. The judge objected, "How does the court handle this when the court has a clear recollection of the juror; what good is a stipulation that apparently is contrary to the facts?" Defense counsel repeated that Mrs. Tamboura was Black, but the judge insisted she was not, saying, "when she described her nationality, it was Indian and the court has a clear recollection that her features and her racial background was that of Indian, not Negro." Once more the judge said he had "a clear recollection of the facts," i.e., that Mrs. Tamboura was not Black but Indian, and concluded, "I just want the record to show what the court recalls of the juror."

Despite his repeated claims of a "clear recollection" of Mrs. Tamboura's race, the judge was wrong. Later in the hearing he admitted that he had confused Mrs. Tamboura with another prospective juror, Ms. Taha, who was in fact Indian: "I should go back on the record and indicate that I have made an error. I've been thinking about—about Miss Taha, when you were talking about Miss Tamboura so my remarks in that regard should be stricken. I had the wrong juror." When the prosecutor described Ms. Taha, the judge conceded, "I recall her and I have the wrong name. So I apologize to you for that, and my remarks about that particular juror, Miss Tamboura, were not appropriate."

cross-section of the community "not be reduced to a hollow form of words, but remain a vital and effective safeguard of the liberties of California citizens." (22 Cal.3d at p. 272.) Applying that principle, both this court and the United States Supreme Court thereafter warned that the constitutional rights protected by the *Wheeler* and *Batson* rules would be defeated if the prosecutor were allowed to discharge his burden by giving vague reasons for his presumptively discriminatory challenges. Thus in *Turner* we admonished that "If such vague remarks were held to satisfy the prosecution's burden of rebutting a prima facie case of group discrimination, the defendant's constitutional right to trial by a jury drawn from a representative cross-section of the community could be violated with impunity." (42 Cal.3d at p. 725.) And in *Batson* the United States Supreme Court likewise cautioned that "If these general assertions were accepted as rebutting a defendant's prima facie case, the Equal Protection Clause 'would be but a vain and illusory requirement.'" (476 U.S. at p. 98 [90 L.Ed.2d at p. 98].)[41]

A fortiori, these fundamental guaranties would also be nullified if a reviewing court were to hold sufficient the showing that the prosecutor offers us here—i.e., subjective reasons that are not only vague in content but are unsupported by any record whatever. Because a defendant can neither rebut such reasons at his *Wheeler* hearing nor challenge them on appeal, they would constitute a procedural barrier to redress as insuperable as the former rule of *Swain* v. *Alabama* (1965) 380 U.S. 202 [13 L.Ed.2d 759, 85 S.Ct. 824], overruled in *Batson* (476 U.S. at p. 100, fn. 25 [90 L.Ed.2d at p. 90]). And our condemnation of the *Swain* rule in *Wheeler* is equally applicable here: "It demeans the Constitution to declare a fundamental personal right under that charter and at the same time make it virtually impossible for an aggrieved citizen to exercise that right." (22 Cal.3d at p. 287.)

---

[41] In his concurring opinion in *Batson* (476 U.S. at p. 106 [90 L.Ed.2d at p. 94]) Justice Marshall expanded on the dangers of accepting generalized subjective reasons offered by the prosecutor: "Any prosecutor can easily assert facially neutral reasons for striking a juror, and trial courts are ill equipped to second-guess those reasons. How is the court to treat a prosecutor's statement that he struck a juror because the juror had a son about the same age as defendant, see *People* v. *Hall*, 35 Cal.3d 161, 672 P.2d 854 (1983), or seemed 'uncommunicative,' *King* [v. *County of Nassau* (E.D.N.Y. 1984) 581 F.Supp. 493], at 498, or 'never cracked a smile' and, therefore 'did not possess the sensitivities necessary to realistically look at the issues and decide the facts in this case,' *Hall, supra,* at 165, 672 P.2d at 856? If such easily generated explanations are sufficient to discharge the prosecutor's obligation to justify his strikes on nonracial grounds, then the protection erected by the Court today may be illusory.

"Nor is outright prevarication by prosecutors the only danger here. '[I]t is even possible that an attorney may lie to himself in an effort to convince himself that his motives are legal.' *King, supra,* at 502. A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically."

V

Not only does the record fail to support both the objective and the subjective reasons offered by the prosecutor for his peremptory challenges of the eight minority prospective jurors, it also fails to show that the trial court fully discharged the duties required of it by our decisions. (Part III, *ante*.) As we have reiterated numerous times, *Wheeler* recognized the general duty of the trial court "to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination." (22 Cal.3d at p. 282.) Implementing that rule, *Hall, Turner,* and *Snow* required the trial court (1) to make a "further inquiry" into any of the prosecutor's proffered explanations that are implausible or suggestive of bias, and (2) to make a "sincere and reasoned" determination whether the explanations (a) are "genuine," i.e., were in fact the reasons why the prosecutor struck the particular juror, and (b) are legally sufficient, i.e., invoke grounds of specific bias rather than group bias. (*Hall,* 35 Cal.3d at pp. 167-169; *Turner,* 42 Cal.3d at pp. 727-728; *Snow,* 44 Cal.3d at p. 226.)

In the case at bar the trial court performed, at most, only the last of these duties. Although as shown above (part II, *ante*) many of the prosecutor's proffered explanations were either implausible or suggestive of bias, the court made no inquiry into any of them; instead, as in *Hall* and *Turner,* in each instance the court simply "listened to the prosecutor without question" (42 Cal.3d at p. 727).

The court then determined the motion by an oral ruling that began, "As far as the three groups mentioned initially, Blacks, Jewish and Orientals, in every instance [the prosecutor has] given an explanation for his reasons, . . ." To so state, of course, is simply to note the fact—which no one questions—that the prosecutor gave certain explanations ("specific reasons") for the challenges in issue; it does not find that those explanations were either genuine or legally sufficient. The court continued its oral ruling with a rambling statement that borders on the unintelligible.[42] Viewed generously and in light of other remarks by the court, the statement may mean the court generally understood the difference between group bias and specific bias. And the court ended its ruling by saying, "there are no jurors in that particular class that the court feels that the challenge was exercised on an undue bias basis." Beneath its tortured syntax this remark may be taken

---

[42] According to the transcript the court said, "I do not think it's saying that the prosecution agree—that the prosecution does not have right to exercise a peremptory challenge, or that it seems to me that the restriction based upon that on the prosecution by *Wheeler,* that it's not to be done on the sole basis that the juror's bias places him in a group. That it has to be done on an individual evaluation of each juror or if it's a bias, the individual bias of a juror, and I can't—. . . ."

to imply a finding that the prosecutor's explanations were legally sufficient, i.e., that each invoked a ground of specific rather than group bias.

But it is no more than that—in particular, it does not imply finding that the prosecutor's explanations were bona fide. Indeed, the record expressly refutes any such implication. At the outset of the hearing, before the prosecutor offered his reasons, counsel for codefendant made the following motion: "If the prosecution is now going to attempt to explain what appears to be a systematical exclusion, I'd ask the prosecutor be put under oath. I think it's the only fair way in order to assure all on the record that the reasons given are those specifically which the prosecutor had in mind in making his peremptory challenges." The court asked for the purpose of the motion, and counsel reiterated, "So that we are all assured that he tells the truth in terms of his reasons for excluding or attempting to justify the exclusion of certain classes of persons." The prosecutor opposed the motion and the court denied it. In so doing, however, it made the following ruling: "I will accept the statements of counsel as an officer of the court on the record as to the voir dire of these jurors before the court." In other words, the court declared in advance that it would "accept" as true each of the prosecutor's assertions as to why he struck the challenged jurors, simply because he is "an officer of the court." The court thus formally abdicated its duty to determine whether the proffered explanations were genuine. Here, as in *Hall* (35 Cal.3d at p. 169), "Such abdication is inconsistent with the court's obligations under *Wheeler,* and on authority of that case must be held to constitute error requiring reversal."

## VI

I turn now to the majority's brief discussion of the *Wheeler* issue. (*Ante,* pp. 1215-1222.) The majority go astray on both the facts and the law. First, their cursory summary of the prosecutor's reasons (*ante,* pp. 1218-1219) is inadequate in two respects: to the extent it relies on objective reasons cited by the prosecutor it omits the many facts of record identified herein (part II, *ante*) that reveal those reasons to be either implausible or suggestive of bias; and to the extent it relies on the prosecutor's subjective reasons, it allows the prosecutor to overcome a presumption of unconstitutionality by making claims that are unsupported by any record whatever and thus deny the defendant his right to judicial review (part IV, *ante*).

Second, the majority's deference to the trial court's ruling herein is predicated on their belief that "there is nothing suggesting that the court misunderstood its obligation to evaluate the prosecutor's explanations." (*Ante,* p. 1218.) But as I have just explained (part V, *ante*), the record demonstrates that the trial court in fact misunderstood its obligations—after defendant's

prima facie showing of discrimination—(1) to inquire further into the reasons offered by the prosecutor and (2) to determine if those reasons were genuine.

The majority also err on the law. They claim to "return to a standard of truly giving great deference to the trial court in distinguishing bona fide reasons from sham excuses." (*Ante,* p. 1221.) But the matter is unfortunately not that simple. Even the most conscientious trial judge can be misled by such extraneous pressures as a reluctance to dismiss the venire after some or all of the jurors have been seated, or a felt urgency to begin taking testimony in a trial expected to be lengthy, or a natural disinclination to disbelieve assertions of good faith made by an attorney in open court. An appellate court, of course, is removed from such pressures. For this and other reasons we have recognized that although appellate courts should generally defer to trial courts in factual or discretionary matters, "deference is not abdication." (*People* v. *McDonald* (1984) 37 Cal.3d 351, 377 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011].)

That admonition applies no less in the present context: as we summarized the matter in *Turner* (42 Cal.3d at p. 720, fn. 6), "To the extent that a trial court's ruling on the proffered explanation of a prosecutor turns on the latter's credibility, we agree with the United States Supreme Court that 'a reviewing court ordinarily should give those findings great deference.' (*Batson* v. *Kentucky, supra,* 476 U.S. at p. 98, fn. 21 [90 L.Ed.2d at p. 89].) Our decisions demonstrate, however, 'ordinarily' does not mean 'inevitably': in some cases *the reviewing court may conclude that the explanation is inherently implausible* in light of the whole record. And even when there is no doubt of the prosecutor's good faith, the issue whether a given explanation constitutes a constitutionally permissible—i.e., nondiscriminatory—justification for the particular peremptory challenge *remains a question of law.*" (Italics added.) (Accord, *People* v. *Granillo* (1987) 197 Cal.App.3d 110, 120 [242 Cal.Rptr. 639].)

The majority also disapprove *Trevino* on two grounds, but neither is well taken. Relying mainly on a dissenting opinion in that case, the majority begin by condemning *Trevino* because it held insufficient the prosecutor's subjective reasons for striking the minority jurors. (*Ante,* pp. 1219-1220.) But I have already explained why a reviewing court should not accept subjective reasons on a silent record. (Part IV, *ante.*) *Trevino* was merely the first case to reject such reasons as insufficient; the issue was simply not raised on the facts of *Wheeler, Hall,* or *Turner.*

Secondly, the majority disapprove *Trevino* because it gave some weight to the fact that certain of the prosecutor's stated grounds for striking minority

prospective jurors applied equally well to nonminority jurors, yet he did not challenge the latter on those grounds. (*Ante,* p. 1220.) The majority seek to justify such disparate treatment by theorizing that a prosecutor may give a different weight to the same factor when the "mix" of the jurors changes because of excusals, or when the prosecutor runs low on peremptory challenges. (*Ibid.*) For example, the majority speculate that the prosecutor may use his peremptory challenges "freely" early in the voir dire but "be more hesitant" later when he has fewer challenges left. (*Ante,* p. 1221.) Yet the majority never tie this speculation to the facts of *this* case—i.e., they never show that here the prosecutor struck the minority prospective jurors early in the voir dire, or that the nonminority jurors with similar backgrounds were called to the box later in the voir dire. Without such a showing the majority's argument remains merely empty rhetoric.

By contrast, in appropriate cases a comparison of the prosecutor's treatment of minority and nonminority prospective jurors can be a highly useful analytical tool: when the record shows disparate treatment and it remains unexplained, how else is a court to determine the genuineness of the prosecutor's claimed reason? In these circumstances the inference that the claimed reason is not the actual ground of the challenge may not only be reasonable, it may be compelling. To prohibit courts from drawing that inference in proper cases will deny them a valuable tool that aids them in discharging their duties under *Wheeler* and *Batson.*

Even harder to explain is why the majority choose to attack *Trevino* for this issue. Virtually every one of our decisions both before and after *Trevino* relied on this same analytical technique. Thus in *Wheeler* we authorized the technique by plain implication when we said that in seeking to justify his challenges the prosecutor may "demonstrate that in the course of this same voir dire he also challenged similarly situated members of the majority group on identical or comparable grounds." (22 Cal.3d at p. 282.) If the prosecutor may do so, of course, the defendant or the courts may do the converse, i.e., may show that although the prosecutor had "identical or comparable grounds" to challenge "similarly situated members of the majority group," he refrained from doing so. This implication was strengthened in *People* v. *Allen* (1979) 23 Cal.3d 286, 291 [152 Cal.Rptr. 454, 590 P.2d 30], when we reasoned that the defendant made a prima facie case of group bias in part by showing that the prosecutor had struck certain "black jurors to whom he had addressed questions and whose answers revealed backgrounds and family contacts that were similar to white jurors with whom the prosecution was satisfied."

The *Wheeler* implication became a square holding in *Hall,* when we rejected the prosecutor's reasons as implausible largely because they were

equally applicable to nonminority jurors whom the prosecutor did not challenge. (35 Cal.3d at p. 168.) Indeed, as noted above we even declared that "Such disparate treatment is *strongly suggestive of bias,* and could *in itself* have warranted the conclusion that the prosecutor was exercising peremptory challenges for impermissible reasons." (*Ibid.,* italics added.)

With such precedents on the books, we had ample authority in *Trevino* to employ the same technique when the facts warranted it. Nor was *Trevino* the last case to do so: as noted above (part III, *ante*), in *Turner* we repeatedly compared the reasons given by the prosecutor with similar factors present in the voir dire of the jurors whom he did not challenge. (42 Cal.3d at pp. 723-727.)

Our Courts of Appeal have also used this analytical tool as an aid in determining the sufficiency of the prosecutor's reasons. (E.g., *People* v. *Granillo, supra,* 197 Cal.App.3d 110, 120-121.) No Court of Appeal has doubted the propriety of giving weight to such "disparate treatment evidencing disingenuousness." (*People* v. *Clay* (1984) 153 Cal.App.3d 433, 436 [200 Cal.Rptr. 269].)

The *Wheeler* rule has been followed, moreover, in a number of our sister states. (See, e.g., *Fields* v. *People* (Colo. 1987) 732 P.2d 1145, 1148-1157; *State* v. *Gilmore* (1986) 103 N.J. 508 [511 A.2d 1150, 1157-1169]; *Riley* v. *State* (Del. 1985) 496 A.2d 997, 1010-1013; *State* v. *Neil* (Fla. 1984) 457 So.2d 481, 484-487; *Commonwealth* v. *Soares* (1979) 377 Mass. 461 [387 N.E.2d 499, 508-518]; cf. *State* v. *Crespin* (1980) 94 N.M. 486 [612 P.2d 716, 717-718].) None of these courts has questioned the analytical tool now criticized by the majority.

For example, the New Jersey Supreme Court recently embraced the use of this very technique in *State* v. *Gilmore, supra,* 511 A.2d 1150. There a Black defendant, represented by Black counsel, was tried by a White prosecutor and convicted by an all-White jury. The prosecutor had struck seven Black prospective jurors by peremptory challenges. The New Jersey intermediate appellate court reversed the judgment on *Wheeler* grounds, and the state supreme court upheld its decision in an opinion that closely tracks the reasoning of both *Wheeler* and *Batson,* quoting repeatedly from each. In particular, when giving his reasons for striking each of the seven Black prospective jurors the prosecutor in *Gilmore* explained that he wanted to put on the jury persons who were "without maternal family instincts," were "of the professional type," and were of a high level of intelligence; he also relied on his "gut reaction" to the individual jurors. (511 A.2d at p. 1167.) The New Jersey Supreme Court tested the genuineness of these explanations by turning to the record to learn whether the prosecutor had also

struck White prospective jurors on the same grounds; and the court held that his failure to do so was "highly probative" in sustaining the defendant's burden of proving a denial of the constitutional right to an impartial jury. (*Ibid.*) Thus the court reasoned that "In assessing his proffered justifications, the Appellate Division rightly found highly probative *his failure to exercise peremptory challenges to remove white prospective jurors who by his own criteria ought to have been removed.* For example, whereas two black women were removed because of their 'maternal family instincts' and because they were not 'of the professional type,' six white women, all of whom by the assistant prosecutor's criteria presumably had 'maternal family instincts,' were permitted to serve. And five of these six were not 'of the professional type,' three being housewives and two being secretaries. The only real difference between the two black women and the six white women was their race.

"Moreover, given that by the assistant prosecutor's own admission the State had a substantial case and that the issue to be resolved was not very complicated—essentially one of identification of defendant as the perpetrator—the Appellate Division justifiably found that 'the assistant prosecutor's explanation that only the intellectual type was suitable for jury duty lacks genuineness.' [Citation.] There was 'no reasonable relevancy between the issues to be resolved by the jury and the high intellectual achievement of jurors,' [citation] *all the more so since the record did not suggest that he insisted upon intellectual achievement by white jurors.*" (Italics added, fn. omitted.) (511 A.2d at p. 1168.)

Federal courts also use this analytical tool. For example, in *Roman* v. *Abrams* (2d Cir. 1987) 822 F.2d 214, a White defendant was convicted principally on the testimony of a Black informant who had turned state's evidence. During voir dire the prosecutor struck numerous White prospective jurors and allowed only three to serve on the jury. On federal habeas corpus the district court found a prima facie case that the prosecutor had challenged the White jurors on racial grounds alone, then rejected the prosecutor's stated attempts at justification as either trivial, incredible or strongly suggestive of bias. The Second Circuit Court of Appeals upheld that finding, reasoning first that "Such general responses as 'lifestyle' and 'background' were properly rejected as inadequate statements of racially neutral reasons, given the prima facie case of discrimination" shown by the defendant. (*Id.* at p. 228.) Other proffered explanations, e.g., that a prospective juror's knowledge of bookkeeping or computers might prevent him from accepting the reasonable doubt standard of proof, "were on their face unworthy of belief." (*Ibid.*) Finally, in language particularly relevant here the Second Circuit stressed that "though the law enforcement connection was used as an explanation for some of the challenges to White prospective

jurors, *some non-white prospective jurors with similar connections went un-challenged by the State.*" (*Ibid.*, italics added.)

It is difficult to understand why the majority disapprove *Trevino* on this issue in light of the foregoing precedents in *Wheeler,* in *Hall,* in *Turner,* and in similar state and federal decisions. If the majority truly intend to adhere to the *Wheeler* rule, they cannot rationally reject this integral step of the *Wheeler-Hall-Turner* analysis.

## VII

In the case at bar the prosecutor was required to justify his peremptory challenges of eight minority prospective jurors. In *Wheeler* we held that such a justification fails if the burden "is not sustained as to *any* of the questioned peremptory challenges," because "the complaining party is entitled to a random draw from an entire venire—not one that has been partially or wholly stripped of members of a cognizable group by the improper use of peremptory challenges." (22 Cal.3d at p. 282, italics added.) It follows that reversal is required under the *Wheeler* rule even if only one prospective juror is improperly struck on discriminatory grounds. (*Johnson,* 22 Cal.3d 296; *People* v. *Granillo, supra,* 197 Cal.App.3d 110, 121.) The same is true under the *Batson* rule: "we emphasize that under *Batson,* the striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated, and even when there are valid reasons for the striking of some black jurors." (*United States* v. *Battle* (8th Cir. 1987) 836 F.2d 1084, 1086, and cases cited.) On the record before us, the People have not met this standard of proof. These errors are prejudicial per se. (*Wheeler,* 22 Cal.3d at p. 283; *Batson,* 476 U.S. at p. 100 [90 L.Ed.2d at p. 90].) *Wheeler* and *Batson* therefore compel reversal of the judgment.

Broussard, J., concurred.

Appellant's petition for a rehearing was denied May 4, 1989. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.